Stephen H. Kline
Kline Law Office, P.C.
P.O. Box 1938
Cheyenne, WY 82003-1938
(307) 778-7056
(307) 635-8106 (f)

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

\* \* \* \* \*

| | |
|---|---|
| JAMES F. RIPLEY, D.D.S, M.H.A. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 06-CV-0091-J |
| ) | |
| WYOMING MEDICAL CENTER, ) | |
| INC., a Wyoming Corporation and ) | |
| JAMES ANDERSON, M.D., JOHN D., ) | |
| BAILEY, M.D., STEVE CHADDERDON, ) | |
| THOMAS CUNNINGHAM, M.D., MARK ) | |
| DOWELL, M.D., KEN EICKOFF, PAM ) | |
| FULKS, BILL MCDOWELL, MARK ) | |
| MCGINLEY, M.D., SUSIE MCMURRY, ) | |
| STEVEN ORCUTT, M.D., DIANE PAYNE,) | |
| MIKE REID, ED RENEMANS, ) | |
| CRAIG SMITH, M.D., LOUIS STEPLOCK,) | |
| M.D., WERNER STUDER, M.D., JAY ) | |
| SWEDBERG, M.D. and ROBERT ) | |
| TRIPENY, as Individuals. ) | |
| ) | |
| Defendant. ) | |
| ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, by and through his attorney, Stephen H. Kline, submits the following Opposition to Defendants' Motion for Summary Judgment:

## STATEMENT OF FACTS

Defendants' *Statement of Facts* assumes facts most favorable to Defendants and cites to testimony that does not appear in the record. Since this obviously does not meet the standard for summary judgment, Plaintiff restates the facts as reflected by the record and in the light most favorable to him.

A.    General Background

Wyoming Medical Center (hereinafter sometimes referred to as "WMC") is the only in-patient hospital facility in Natrona County, Wyoming. (Admitted in ¶10 of *Answer of Defendants*). 98% of all of the Natrona County residents seeking in-patient care utilize WMC. Plaintiff is a board certified Oral and Maxillofacial Surgeon who has lived and practiced in Natrona County since 2003. Dr. Ripley attended dental school at the State School of New York at Buffalo, obtaining a D.D.S. degree in 1972 and subsequently completed a four year residency in Oral and Maxillofacial Surgery, which included a one year internship in anesthesiology, at the University of Texas Health Sciences Center in San Antonio Texas. (Ripley depo. at 12-13; Exhibit 1 to Ripley depo.). This lawsuit arises from WMC's refusal to grant Dr. Ripley Medical Staff and admitting privileges at its facility.

Traditionally, dentists who have a general office practice have not needed or utilized full membership on hospital staffs to practice their specialty, and thus they have often been relegated

2

to the role of consulting physicians in a hospital setting.  However, Oral and Maxillofacial Surgeons have medical practices which require in-patient care, and their training following dental school is much different than that of an ordinary dentist.  (Ripley depo. at 12-13, 27-28, 128-129, 309-312).  They treat injuries of the head and neck similar to and in competition with otolaryngologists and plastic surgeons.  Oral surgeons are members of hospital staffs with admitting privileges throughout the country.  (Ripley depo. at 19-20).

The contention by the Defendants that oral surgeons are unqualified by training to admit patients and to do a history and physical (h&p) on their patients simply isn't true, and it isn't even believed to be true by the staff of WMC.  Dr. Ripley's internship and residency were the exact same internships and residencies taken by students with M.D. degrees.  He testified that in all other locales in Texas and Arizona where he has practiced, he has been a full member of the hospital staff with admitting and h&p privileges.  (Ripley depo. at 19-20).  Other oral surgeons in the State of Wyoming also have admitting and h&p privileges.  (Ripley depo. at 19-20, 163-164).  Dr. Rex Dolan, an oral surgeon in Cheyenne, Wyoming, is a member of Cheyenne Regional Medical Center's medical staff and on track to become its Chief of Staff.  (Studer depo. at 34).

When this issue was first addressed by the Medical Staff of WMC as it related to Dr. Ripley's request to be a full member of that Staff, the Executive Committee of the Medical Staff acknowledged that his request was not unusual.  The minutes of the Executive Committee meeting of November 2, 2005 at which meeting Dr. Ripley's request for Staff privileges was addressed read in part as follows:

3

"Admitting patients and getting consultations as appropriate are privileges that oral surgeons traditionally have been given. There was discussion about board eligible/board certified requirement. It was suggested that patients with medical problems would need a consult. Members agreed that getting consults as appropriate is expected of all members of the medical staff. Members agreed that the bylaws should be amended to include oral and maxillofacial surgeons as members of the medical staff with admitting privileges without limitation or restriction."

(WMC Executive Committee minutes attached hereto as Exhibit 1).

In fact, for a period of time in the recent past, WMC treated oral surgeons as full members of its Medical Staff. In 2000, the WMC Bylaws were changed and for purposes of this lawsuit, WMC takes the position that those changes prohibit oral surgeons from being members of the Medical Staff. (Chadderdon depo. at 28; Payne depo. at 24; Reid depo. at 26-27, 55-56; Studer depo. at 27-28). The Hospital and Medical Staff Bylaws are not in fact clear in this regard, and there has been no testimony that the changes were directed at oral surgeons. At least one physician believes that the Hospital drafted new categories of health care providers in conjunction with a chiropractor's attempt to gain admitting privileges to WMC. (Studer depo. at 29).

For whatever reason, in 2000 the definition of physician found in the Medical Staff bylaws was changed to include only individuals with an M.D. or D.O. degree, and all "dentists" were placed in a category of "Allied Health Professionals." However, the definition of "Medical Staff" in both the Hospital and Medical Staff Bylaws still includes "physicians, D.O's, D.D.S's and podiatrists" (WMC Bylaws, Art. VIII, Secs. 2, 4, 7; WMC Medical Staff Bylaws 1.9). Moreover, the Medical Staff Bylaws specifically state that the qualifications for the

4

Medical Staff do not include the holding of any specific degree.  (WMC Medical Staff Bylaws

3.4).  WMC also treats oral surgeons as physicians with regard to the handling of other

operations of its Hospital.  (WMC Trauma On-Call Roster attached hereto as Exhibit 2).

B.      Dr. Ripley's Application and Subsequent Efforts to Become a Member of the UMC
        Medical Staff

        Dr. Ripley moved to Casper in the fall of 2003 and applied for hospital privileges.  He

was provided with an application form allowing him to seek privileges under the category of an

Allied Health Professional.  (Ripley depo. at 59-60).  Allied Health Professionals are health care

providers who are allowed privileges at WMC but who are not full members of the Medical

Staff.  Allied Health Professionals are not automatically allowed to admit patients to WMC, and

their privileges may be terminated at any point by the hospital without a hearing.  (Reid depo. at

51).  However the Medical Staff Bylaws provide that they may be given clinical privileges at the

discretion of the Staff and the Board.  (WMC Medical Staff Bylaws 8.1).

        Although Dr. Ripley made his application for privileges on a form designated for Allied

Health Professionals, he handwrote on his application that he was requesting full admitting and

history and physical privileges.  (Ripley depo. at 47-48, 59-60, 84).  Following its submittal, his

application worked its way through a number of committees.  On November 21, 2003 the head of

the Department of Surgery recommended that Dr. Ripley be granted privileges as he had

requested them.  However, on December 8, 2003, the head of the Credentials Committee wrote

that he recommended that Dr. Ripley's privileges come with conditions. (Exhibit 4 to Ripley depo.).

The recommended conditions handwritten by the head of the Credentials Committee are extremely difficult to discern, but on December 11, 2003, Dr. Ripley was granted temporary hospital privileges with the apparent condition from the Credentials Committee typed on the bottom. Those conditions stated that a physician member of the Medical Staff must either perform Dr. Ripley's pre-op history or document that they have reviewed, approved and found Dr. Ripley's history and physical acceptable prior to him performing surgery. (Exhibit 5 to Ripley depo.; Ripley depo. at 54). It is unclear why the Credentials Committee made that recommendation or for how long it was to be in place. However, regardless of the h&p recommendation from the Credentials Committee, the temporary privileges provided to Dr. Ripley gave him admitting privileges. (Studer depo. at 13-14; Ripley Affidavit attached hereto as Exhibit 3).

Dr. Ripley did not agree with the h&p limitations recommended by the Credentials Committee, and on December 15, 2003, he wrote a letter to the chairman of the Credentials Committee explaining his objection to the limitations. In that letter, Dr. Ripley states "I would like to suggest that the Committee be notified of a series of my first admissions so that the members of the Committee, to their satisfaction, can review my patient work ups and specifically h&ps. It might well start with the patient now in-house." Dr. Ripley's letter clearly reflects his understanding that he was to be able to admit patients to WMC. (Ripley depo. at 80-81; Exhibit 9 to Ripley depo.).

6

Following Dr. Ripley's letter objecting to the Credentials Committee's recommendations, on January 6, 2004, the Chief of WMC's Executive Committee approved Dr. Ripley's request for admitting and clinical privileges "as requested" and without conditions. (Exhibit 4 to Ripley depo.). On January 14, 2004, the Board of Directors of WMC also approved his privileges "as requested" and without conditions. From December of 2003 through August 2004, Dr. Ripley admitted numerous patients to the hospital and did their h&ps without consultation from any other member of the Medical Staff. It is uncontroverted that no member of the Medical Staff or of UMC's administration objected to Dr. Ripley admitting or doing h&ps on any patient during this period of time. (Ripley depo. at 81-83, 187-188, 190).

In August of 2004, Dr. Mary MacGuire, the Chairman of the Surgery Department, wrote Dr. Ripley and told him that she had been informed by someone that AHP's did not have admitting privileges and that Dr. Ripley was thus not allowed to admit patients as he had been doing. (Exhibit 10 to Ripley depo; Ripley depo. at 83-84, 123-124, 239). No one has ever acknowledged who approached Dr. MacGuire with this concern or why. Although Dr. MacGuire's initial correspondence with Dr. Ripley concerning this issue indicated that "we will start working on changing this regulation", two months later, Dr. Ripley was informed by WMC's Chief of Staff that the "Executive Committee does not want to pursue this". (Exhibit 14 to Ripley depo.; Ripley depo. at 102).

At the time that the issue concerning the bylaws change arose in the late summer and fall of 2004, Dr. Ripley was employed by the Community Health Center of Central Wyoming, Inc, and Dr. Ripley resolved his problem by having his patients admitted through Community Health.

7

(Ripley depo. at 110-111, 113, 137). However, after leaving Community Health in 2005 and starting his own private practice, Dr. Ripley again raised the issue of his admitting and h&p privileges. When the issue was raised with the Medical Staff in the fall of 2005, there was a new Chief of Staff, and the Medical Staff seemed willing to work with Dr. Ripley to resolve the issue through a by-law change. (Ripley depo. at 141, 176-178, 183).

A proposed by-law change was drafted and sent to the Credentials Committee in October 2005 where it passed unanimously. (WMC Credentials Committee minutes attached hereto as Exhibit 4). The proposed change then went to the Executive Committee where again in November of 2005 it passed unanimously and was forwarded on for a full vote of the Medical Staff. (WMC Executive Committee minutes attached hereto as Exhibit 1). It was at this meeting of the Executive Committee where the minutes reflect that those present recognized that what Dr. Ripley was requesting was nothing out of the ordinary for members of his specialty.

Following the votes of the Credentials Committee and the Executive Committee, the Chief of Staff, Dr. Werner Studer, set a meeting of the general Medical Staff to vote on the proposed by-law change. This meeting was set for January 24, 2006. After consultation with the administration of WMC, Dr. Studer cancelled the meeting without explanation shortly before it was to take place. (Payne depo. at 14-16; Reid depo. at 33-34, 67; Ripley depo. at 190-193; Studer depo. at 12; Cancellation Notice attached hereto as Exhibit 5). He cancelled the meeting despite the fact that under the Medical Staff Bylaws, the proper manner of amending the Bylaws is through a vote of the Medical Staff. (WMC Medical Staff Bylaws 14.5)

8

The matter was instead referred to a committee of the Hospital called the Medical Staff Development Committee (sometimes hereinafter referred to "MSDC"). (Chadderdon depo. at 14-15; Payne depo. at 14-16, 22-23; Reid depo. at 33-34, 40-41; Ripley depo. at 191-192; Studer depo. at 21). While the WMC Bylaws indicate that one of the duties of the MSDC is the recommendation of the makeup of the Medical Staff, they also specifically provide that the appropriate manner of changing the Medical Staff Bylaws is through the process set forth in the Medical Staff Bylaws. As stated above, that process requires a two-thirds vote of the Medical Staff. Although to become effective the amendment also would have had to have been approved by the WMC Board, such approval cannot "be unreasonably delayed or withheld." (Payne depo. at 10; WMC Bylaws, Sec. 2, 6; WMC Medical Staff Bylaws 14.5).

A meeting of the MSDC was held on February 6, 2006 at which meeting Dr. Ripley was allowed to present his position. Following his presentation, the Medical Staff Development Committee voted against the proposed bylaw change. The reason for the vote as contained in the minutes of the meeting has nothing to do with the qualifications of oral surgeons to be members of the WMC staff. Instead the MSDC found that there are already "appropriately trained and credentialed primary care physicians available to admit patients" and that a change in the Bylaws would "not provide an increase or improvement in available patient care." (Chadderdon depo. at 20, 25-26; Payne depo. at 26, 29-30, 41-42, 46; Ripley depo. at 193-194, 220, 222; Studer depo. at 19, 22-23; Exhibit 30 to Ripley depo; Exhibit 2 to Chadderdon depo.).

The matter was subsequently forwarded to WMC's Board which met concerning this issue despite the fact that the appropriate entity to address the MSDC's recommendations

9

appears to have been the Medical Staff. Dr. Ripley was not invited to attend. The WMC Board voted to accept the recommendation of the MSDC and to deny the proposed change without any substantive comment. (Chadderdon depo. at 35-36; Reid depo. at 41, 52; Ripley depo. at 222-223; Studer depo. at 32-33; Exhibit 30 to Ripley depo.; Board meeting minutes attached hereto as Exhibit 6). Dr. Ripley's efforts to get Medical Staff privileges through the administrative channels ended because the Hospital administration continues to take the position that to allow Dr. Ripley such privileges violates the Medical Staff Bylaws. This litigation against WMC and the individual members of the MSDC and the Board followed.

WMC has waived its attorney/client privilege and listed two of its attorneys as witnesses in this case to testify as to the advice that they gave regarding this issue. Despite the fact that they are listed as witnesses, the Defendants have not produced any e-mails or written correspondence from them regarding their advice relating to how to address the proposed change in hospital bylaws. The attorneys have not been deposed, and no affidavit containing their conversations or advice has been provided to the Court even though in their brief, Defendants inappropriately refer to what that advice might have been without citation. Significantly, the one e-mail that has been produced from one of its in-house attorneys, Richard Williams, to a consulting attorney named Elsie Brennan from Tulsa, Oklahoma contains some intriguing language. The e-mail came after the vote of the Medical Staff Development Committee, and in it, Mr. Williams states "I don't know where (Ripley) would appeal it to, since tonite I am sure that the Board will accept MSD's recommendation." (E-mail attached hereto as Exhibit 7). Ms. Brennan's response has not been produced.

## STANDARD OF REVIEW

Defendants accurately cite the standard for review in this case, and Plaintiff need not recite it in its entirety.  However, it is significant to reiterate that the Court must examine all the evidence in light most favorable to Dr. Ripley, and Dr. Ripley merely needs to show specific facts showing that there is a genuine issue for trial in this matter. *Thomas v. IBM,* 48 F.3d 478, 484 (10th Cir. 1995).

## LEGAL AUTHORITIES AND ARGUMENT

A.    The Disputed Material Facts Demonstrate That Plaintiff Can Establish an Agreement Between the Defendants in Violation of Section 1 of the Sherman Anti-trust Act

Plaintiff alleges that the Defendants combined and conspired to illegally boycott Plaintiff and all Oral and Maxillofacial surgeons and prevent them from attaining hospital staff privileges for which they are qualified by education and training.  Section 1 of the Sherman Anti-trust Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." *15 U.S.C. §1.*

The Defendants initially argue that Plaintiff cannot prove that an agreement to restrain trade existed.  In arguing that Plaintiff cannot prove that there was an agreement, Defendants point this Court to a recent decision of the Tenth Circuit, *Abraham v. Intermountain Healthcare, Inc.*, 461 F.3d 1249 (10th Cir. 2006).  In that case, a group of optometrists sued a managed healthcare company which excludes optometrists from its network of providers.  While the Tenth

Circuit found that there was no viable anti-trust claim in that case, the facts of the situation differ significantly from those here.

In *Abraham,* there was simply no evidence that IHC acted in concert with the ophthalmologists who were named defendants. Although the named ophthalmologists lobbied IHC to exclude optometrists from its list of providers, there was no evidence that IHC arrived at its decision to exclude optometrists other than independently. Significantly, the ophthalmologists played no role in the decision other than to voice their opposition to optometrists as providers. The Tenth Circuit found under existing precedent that the fact that the ophthalmologists had lobbied IHC to prevent optometrists from participating in the contract did not suffice to act as evidence of a conspiracy. While the Tenth Circuit went into detail about the limitations of inferences that can be drawn in anti-trust cases, there was simply no evidence that the ophthalmologists participated in the decision to exclude optometrists from the contract.

The factual background of this case is significantly different. While certain physicians who were opposed to oral surgeons being in a position on the staff evidently lobbied the MSDC and the Board, none of the Defendants in this case were named because of his or her lobbying efforts. (Letter from Mary Weber attached hereto as Exhibit 8). Instead, each of the Defendants in this case is a member of either the Medical Staff Development Committee or the WMC Board who participated in the decision and voted not to allow oral surgeons to be members of the Medical Staff. A hospital and its medical staff are two separate entities capable of conspiring with each other for purposes of the Sherman Antitrust Act if the medical staff has a dual purpose of furthering its own economic self interest. *Cooper v. Forsyth County Hosp. Auth., Inc. 789*

12

F.2d 278 (4th Cir. 1986). *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249 (10th Cir. 2006). Since the WMC Board and the MSDC are made up of practicing physicians as well as hospital administrators and Board members who have distinct economic interests, they are distinct entities capable of conspiring together for purposes of the anti-trust laws. *Weiss v. York Hospital*, 745 F. 2d 786, 816 (3rd Cir. 1984), *cert denied*, 470 U.S. 1060, 105 S. Ct. 1777, 84 L.Ed. 836 (1985).

There are significant questions of fact raised by the evidence as to why the Defendants voted as they did. As stated above, there was no information presented to the MSDC or the Board and no finding made that oral surgeons are unqualified to be members of the Medical Staff or should not have admitting privileges. The Medical Staff Executive Committee recognized only two months before the vote of the MSDC that oral surgeons are treated as members of medical staffs throughout the country. The information presented to the MSDC and the Board was that Dr. Ripley had been a member of the medical staff everywhere that he practiced in the past. (Chadderdon depo. at 23-24; Payne depo. at 33-34; Reid depo. at 62). The issue raised by the Defendants in its summary judgment motion, that oral surgeons aren't qualified to treat all co-morbidities with which a patient might present, is no different for oral surgeons than any other practitioner. Like all medical personnel, the question is whether a practitioner has the ability to recognize when he or she needs to consult with others.

In attempting to prove concerted action, a plaintiff may rely upon circumstantial evidence and the reasonable inferences drawn from it to withstand summary judgment. *Gordon v. Lewistown Hospital*, 423 F.3d 184, 208 (3rd Cir.2005). That the Defendants acted in concert can

be inferred by the manner in which the issue came before the Medical Staff Development Committee. At a point in which the matter had passed the Credentials Committee and the Medical Executive Committee and was placed before the entire medical staff for a vote, the Chief of Staff approached the hospital administration seeking to derail the process. While WMC presently contends that the appropriate forum for the change of the bylaws was through the MSDC and the Board, a review of the bylaws of the WMC and the Medical Staff indicate that not to be the case. The appropriate entity to vote on a by-law change is the Medical Staff, and the Board cannot unreasonably withhold its consent of the Medical Staff's recommendation in that regard. (WMC Bylaws, Sec. 2, 6; WMC Medical Staff Bylaws 14.5).

In fact, when Dr. Studer approached the hospital administration about the proposed bylaw change, his concerns apparently had nothing to do with whether or not the change was proceeding through the appropriate channels. He instead had a concern about what the vote of the Medical Staff might accomplish. (Studer depo. at 13-14). In the end, Dr. Studer as a member of the MSDC voted against the bylaws change even though as a member of the Executive Committee he had voted for it a couple of months earlier. (Studer depo. at 16-17). When questioned about the reason for his vote as a member of the MSDC, he testified that he just didn't see any need for the bylaw change. He further testified that he would not have objected to the bylaw change had he thought that it was going to affect Dr. Ripley's ability to practice medicine. (Studer depo. at 22-25).

14

As strange as Dr. Studer's about face on this issue is, his testimony that Dr. Ripley didn't need Medical Staff privileges is stranger yet.  After seeming to downplay the significance of being on the medical staff, the following series of questions and answers then took place.

> Q:     What's the benefit to you of being on the medical staff?
>
> A:     I can provide care.
>
> Q:     What are the benefits of medical staff privileges?
>
> A:     Access to the use of the Wyoming Medical Center.
>
> Q:     All things being equal in your practice, you would rather have medical staff privileges than not?
>
> A:     Yes.

(Studer Depo. at 25-26)

Short of the Defendants testifying that they got together with the explicit purpose of preventing oral surgeons from competing with them, it is hard to imagine more compelling evidence than the testimony of Dr. Studer and the subsequent discussions and vote of the Defendants.  It is unquestioned that the primary beneficiaries of the vote to exclude oral surgeons from the WMC staff are the Hospital and the M.D.s who make up the vast majority of the staff.

WMC's proposed answer to the inability of oral surgeons to admit patients is for oral surgeons to utilize the new "hospitalist" program at WMC to do their admissions and h&ps. (Chadderdon depo. at 21-23; Payne depo. at 29-30, 35-36; Reid depo. at 57-58). Hospitalists are employees of the hospital who generally are internists or primary care physicians like Dr. Studer.  They are available to admit patients and provide care for them when the treating

physician so elects. (Chadderdon depo. at 21-23; Payne depo. at 29-30, 35-36; Reid depo. at 57-58).  WMC baldly asserts in its pleadings that the hospitalists will admit Dr. Ripley's patients for free, but that offer has never been made to Dr. Ripley and does not appear anywhere in the documentation surrounding this litigation. (Payne depo. at 37; Ripley depo. at 161, 221).  The Defendants also do not explain in their brief why a hospitalist is more qualified to admit and do an h&p on a patient with head and/or neck trauma than an oral surgeon.

That the M.D. members of the MSDC and the Board had undue influence on the decision to exclude oral surgeons is also evident from the testimony.  The lay members of the MSDC and the Board have testified that they had no way of evaluating the issue other than through the statements of the members of the Medical Staff. (Chadderdon depo. at 16-22; Payne depo. at 38-39, Reid depo. at 36-40, 43-44, 63-64).  The Medical Staff and WMC's administration combined to eliminate potential competitors through the vote of the MSDC and the Board.  No other rational explanation exists for the actions of the MSDC and Board in usurping the power of the entire Medical Staff to address the proposed bylaws change.

Group boycotts have been held to be a per se violation of Section 1 of the Sherman Act. *Tarabishi v. McAlester Regional Hospital,* 951 F.2d 1558, 1570 (10th Cir. 1991).  While individual physicians can be excluded from a medical staff on the basis of lack of competence or unprofessional conduct, entire categories of medically trained individuals cannot be excluded because of the degree that they obtained. *Weiss v. York Hospital,* 745 F. 2d 786 (3rd Cir. 1984), *cert denied,* 470 U.S. 1060, 105 S. Ct. 1777, 84 L.Ed. 836 (1985); *Williams v. Kleaveland et al,* 534 F. Supp. 912, 917 (W.D. Mich 1981); *Pontius v. Children's Hospital et al,* 552 F. Supp.

1352, 1369-1370 (W.D. Penn. 1982). *Weiss* involved a physician who had a D. O. degree who was denied hospital privileges. He alleged that he was denied privileges because of his degree. Although the Court found that the decision had been made because of Dr. Weiss' competence and thus the plaintiff had been unable to prove an anti-trust violation, the Tenth Circuit nonetheless indicated that had the medical staff of the hospital in fact denied Dr. Weiss privileges on the basis of his degree that it would have amounted to a group boycott in violation of the anti-trust laws.

B.    There is a Material Dispute of Fact Regarding Whether the Granting of Admitting, History and Physical Privileges to M.D.'s or D.O.'s is Unreasonable

As set forth above, there certainly is a question of fact as to whether or not it is unreasonable to refuse to grant admitting, history and physical privileges to oral surgeons. The testimony from Dr. Ripley as well as others is that many in-patient facilities around the country do so. (Chadderdon depo. at 23-24; Payne depo. at 33-34; Reid depo. at 62; Ripley depo. at 19-20). The Hospital's Credentials Committee and Medical Executive Committee both voted for the proposed bylaws change, and recognized the fact that it is commonly done in other places. (Credentials Committee minutes attached hereto as Exhibit 4; Medical Executive Committee minutes attached hereto as Exhibit 1).

While Defendants argue that there are quality reasons for its decision, no such reason was given by the MSDC and no reason whatsoever appears for the decision of the Board. The MSDC simply indicated that to allow oral surgeons to have staff privileges would not increase the quality of care. (Chadderdon depo. at 21-22, 26, 31, Payne depo. at 29-31; Reid depo. at 61).

17

Dr. Studer's testimony that he would have voted to allow oral surgeons on the Staff if he thought Dr. Ripley needed to be a member to practice at the hospital is instructive in this regard. He gave no reason for his vote that related to the qualifications of oral surgeons. (Studer depo. at 22-26).

According to the Defendants, the policy is designed to ensure that the medical staff receives a thorough and well-reasoned history and physical of the patient upon admission to the hospital by personnel competent and qualified to assess possible problems with a patient. Defendants take the leap of faith that restricting the qualifications of medical personnel to people with M.D. or D.O. degrees increases this ability. They argue that while an oral surgeon may be competent to diagnose and treat facial fractures and diseases, an oral surgeon may not be as competent to evaluate other medical conditions that present with the same patient at the same time. (Chadderdon depo. at 21-22, 26, 31, Payne depo. at 29-31; Reid depo. at 61).

The problem with this argument is that it is applicable to any health care practitioner of any specialty and is contrary to the Medical Staff bylaws which state that a person is not necessarily qualified to be a member of the staff because that person holds a certain degree. (WMC Medical Staff bylaws 3.4). The most qualified specialist in the world in a particular field needs to obtain a consult when presented with issues which are outside of his or her expertise. The Executive Committee recognized this fact only two months before the Defendants decided to usurp the Staff's vote on the issue. (Executive Committee minutes attached hereto as Exhibit 1).

Defendants' argument that an oral surgeon may not take a history and physical or admit a patient with a co-existing internal medicine complication but that an internist can admit a patient with a co-existing facial fracture must be seen for what it is. It is an attempt to exclude an entire class of competitors from medical care at WMC. It prevents oral surgeons from participating in trauma care and exclusive contracts with the Hospital. It prevents them from competing with otolaryngologists, plastic surgeons and hospitalists all of whom have M.D. or D.O. degrees.

The argument that this policy causes no actual harm to the consumer of health services at WMC is also inaccurate. If a consumer chooses Dr. Ripley to perform specific procedures involving hospitalization, the consumer is subject to an additional unnecessary cost by the charge of a physician or hospitalist who must admit and follow the patient. The consumer may well be turned away from an oral surgeon who is most qualified to handle a procedure of the head and neck because the hospital requires its own internist or hospitalist to do an unnecessary workup of a patient. The argument that the rule is actually pro-competition is difficult to follow to say the least.

Finally, regardless of whether the actions of the Defendants can be found to be reasonable under the "rule of reason" test, Plaintiff has alleged that the actions of the Defendants constitute a per se violation of the antitrust laws because they constitute a group boycott as set forth above. Their action also constitutes a per se violation because they have denied Dr. Ripley access to a facility that is necessary for him to be able to compete. This doctrine is known as the "essential facilities" doctrine. It imposes upon a "business or group of businesses which controls a scarce facility... an obligation to give competitors reasonable access to it." *Gregory v. Fort*

*Bridger Rendezvous Association*, 448 F. 3d 1195, 1204 (10th Cir. 2006). The doctrine has been applied where the plaintiff is unable to compete without access to the facility. It has been applied to electric transmission lines and gas pipelines, stadiums, downhill ski areas, and telephone facilities.

In order to establish antitrust liability based on the essential facilities doctrine, a plaintiff must show: "(1) control of the essential facility by a monopolist; (2) a competitor's inability to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Pittsburgh County Rural Water Dist. No. 7*, 358 F.3d 694, 721 (10th Cir. 2004). In this case, WMC unquestionably has a monopoly on in-patient services in Natrona County, Wyoming, and Dr. Ripley does not have the ability to duplicate that facility. The only issue is whether Dr. Ripley is being denied access to the facility. While the Defendants may argue that he is not being denied access to their facility, he certainly is being denied full access to the facility as testified to by Dr. Studer. (Studer at 25-26). Not only can Dr. Ripley's privileges be terminated without hearing at any time, he testified that his exclusion from the hospital staff prevents him for competing for trauma patients as well as contracts to do other types of work. (Ripley depo. at 210, 214-215, 217-218). A question of fact exists in this regard.

C.    Whether or Not Defendants Entered Into an Illegal Tying Agreement is a Question of Fact

A "tying arrangement" is an agreement by a party to sell one product on the condition that the buyer also must purchase a different product. *Abraham et al v. IHC et al*, supra. at 1263. In this case the evidence shows that the Defendants have tied a patient's choice of Dr. Ripley's

services to the use of a hospitalist or a physician with an M.D. or D.O. degree. *McKenzie v. Mercy Hospital of Independence, Kansas*, 854 F.2d 365 (10th Cir. 1988). Defendants argue that two distinct products do not exist and cite to the *Abraham* case as support for their argument. However, *Abraham* provides no such support for their argument in this regard.

In *Abraham*, the plaintiff attempted to argue that IHC's managed care plan and the benefits of the plan were two separate products. The Court understandably refused to accept this argument. The facts of this case again are in no way similar. In this case, the Defendants entered into an agreement which requires the consumer who wishes to purchase Dr. Ripley's in-patient services to additionally purchase another product which he or she neither wants nor needs. This product is the services of an intern (hospitalist) or another physician with an M.D. or D.O. degree. WMC and physicians with M.D. or D.O. degrees have an economic interest in the sale of the tied product. This economic interest in the sale of the tied product distinguishes this case from one which does not involve a second distinct product. *Abraham et al v. Intermountain Health Care Inc. et al,* supra at 1265.

The essential characteristic of an illegal invalid tying arrangement is the exploitation of the defendant's control over the tying product to force the consumer to purchase a tied product that the consumer either did not want or alternatively would choose to purchase somewhere else. *Jefferson Parish Hospital v. Hyde,* 466 U.S. 2, 104 S. Ct. 1551, 1558, 80 L.Ed. 2 (1984). Dr. Ripley's patients who need in-service care are placed exactly in this position. Additionally, the services which they are required to purchase are not only unnecessary, they may in fact be harmful to a patient. Under the hospital's rules, an internist or other specialist who has little or

no knowledge of problems related to the face and jaw is required to write a history and physical for a patient who Dr. Ripley admits with no other problem. Not only is this illogical, it is impossible for this to be accomplished safely without Dr. Ripley performing an additional history and physical. Unfortunately, the Defendants will not allow this to occur.

D.  Evidence Exists to Allow Plaintiff's Sherman Act, Section 2 Claim to be Presented to a Jury

Defendants assume for purposes of argument that WMC is a monopolist as it must. It is the only hospital in Natrona County, Wyoming, and relevant statistics indicate that 98% of all patients seeking treatment from Natrona County do so at Wyoming Medical Center. The use of monopoly power to foreclose competition or gain a competitive advantage is unlawful. *Potters Medical Center v. City Hospital Association*, 899 F.2d 568, 575 (6th Cir. 1986).

It cannot be argued that the Defendants and WMC are not competitors of Dr. Ripley. WMC employs hospitalists who compete with Dr. Ripley for fees, and WMC has exclusive contracts with providers, including otolaryngologists who compete with Dr. Ripley. (Community Service Agreement attached hereto as Exhibit 9). While the hospital may not have a duty to cooperate with its rivals, it may not refuse to deal with a competitor unless a valid business reason exists for that refusal.

There is significant evidence that Defendants' business reason for requiring oral surgeons to utilize non-qualified physicians for his admissions and history and physicals is a sham. Not only is the hospital's requirement in this regard unreasonable, the evidence suggests that it is totally illogical. Plaintiff has at least raised a question of fact as to whether any business reason

22

exists to support the refusal to allow admitting privileges to non M.D.'s or D.O.'s who are as well trained. The fact that Defendants insist that an M.D. or D.O. perform history and physicals serves important and legitimate business decisions does not make it so.

WHEREFORE, for the reasons set forth above, Plaintiff prays that the Court deny Defendants' Motion for Summary Judgment in its entirety and that the issues set forth herein be allowed to be proceed to trial.

DATED this 26th day of December, 2006.

KLINE LAW OFFICE, P.C.

Stephen H. Kline
P.O. Box 1938
Cheyenne, WY 82003-1938
(307) 778-7056
(307) 635-8106

Attorney for Plaintiff

CERTIFICATE OF MAILING

I certify that a true and accurate copy of the foregoing instrument was served upon all parties to this action via U.S. mail, postage prepaid, on this 26th day of December, 2006.

Scott E. Ortiz
Williams, Porter, Day & Neville, P.C.
P.O. Box 10700
Casper, WY 82602

23

Judith A.W. Studer
Schwartz, Bon, Walker & Studer, LLC
141 South Center Street, Suite 500
Casper, WY  82601