FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JAN 2 4 2008

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

JAMES F. RIPLEY, D.D.S.,
M.H.A.,

      Plaintiff,

      vs.

WYOMING MEDICAL CENTER,
INC., a Wyoming Corporation
and JAMES ANDERSON, M.D.,
JOHN D. BAILEY, M.D., STEVE
CHADDERDON, THOMAS
CUNNINGHAM, M.D., MARK
DOWELL, M.D., KEN EICKOFF,
PAM FULKS, BILL MCDOWELL,
MARK MCGINLEY, M.D., SUSIE
MCMURRY, STEVEN ORCUTT,
M.D., DIANE PAYNE, MIKE REID,
ED RENEMANS, CRAIG SMITH,
M.D., LOUIS STEPLOCK, M.D.,
WERNER STUDER, M.D., JAY
SWEDBERG, M.D., AND ROBERT
TRIPENY, as Individuals,

      Defendants

Case No. 06-CV-091

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

The Defendants' Motion for Summary Judgment, the plaintiff's response in opposition thereto, the defendants' further reply and all of the parties' supplemental submissions have come before the Court for consideration.  The Court, having reviewed the parties' written submissions, materials filed in support of their respective positions, the pleadings of record, the applicable law, and being fully advised, FINDS and ORDERS that the defendants' motion for summary judgment should be GRANTED, for the reasons stated below.

## Background

Plaintiff filed his complaint against the defendants asserting claims against them pursuant to Sections 6 and 16 of the Clayton Act (15 U.S.C. §§15 and 26) seeking to recover treble damages for and to obtain injunctive relief from injury by the defendants to the property and business of plaintiff sustained by reason of alleged violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2).

Plaintiff is an oral and maxillofacial surgeon with offices in Casper, Wyoming.  Wyoming Medical Center, Inc. is a corporation organized under the laws of the State of Wyoming, operating a hospital facility in Casper, Wyoming providing patient care, education and research.   The individual named

2

defendants Anderson, Bailey, Chadderdon, Cunningham, Eickoff, McDowell, McMurry, Paune, Reid, Studer and Tripeny are members of the Board of Directors of WMC.   Individual defendants Dowell, McGinley, Orcutt, Payne, Smith, Steplock, Studer and Swedberg were, in February 2006, members of the Medical Staff Development Committee making recommendations to the Board of Directors of the hospital as to whether plaintiff or others similarly licensed should be permitted to be members of the Medical Staff of WMC.   Defendants Fulks and Renemans at the time of filing were President and Senior Vice-President of WMC, responsible for its day to day operations.

Plaintiff alleges that WMC is the only facility providing for trauma related and in-patient oral and maxillofacial services in the Casper, Wyoming geographical area.   He contends that to receive referrals from WMC, admit patients to WMC and participate in emergency and trauma cases, and to provide that patients have full access to the hospital's facilities, it is necessary for an oral and maxillofacial surgeon to be a member of the WMC Medical Staff and this status is wrongfully being denied him.

Plaintiff moved to Casper in 2003.   Before that, he had practiced his specialty of oral and maxillofacial surgery in many areas of the country and had received admitting privileges in all hospitals in which he had practiced over the

3

years.  He was granted, as an allied health provider, all privileges as requested,

with full temporary privileges for admitting history and privileges in 2003.

Plaintiff alleges that approximately nine months later, he was informed that his

privileges did not include admitting privileges because the hospital's bylaws

prohibit anyone with a degree other than an M.D. or D.O. from being a member

of WMC's staff and having admitting privileges.  He alleges his privileges were

revoked on or about August 5, 2004.

On three occasions after that date, plaintiff alleges he made a request for

reinstatement of his unrestricted Medical Staff privileges, which were

unsuccessful.  Under the hospital's bylaws, applications for appointment to the

Medical Staff are considered by the Credentials Committee initially.   The

recommendations of the Credentials Committee are then sent on to the

Executive Committee of the Medical Staff.  If the Executive Committee's

recommendation is favorable to the applicant, that recommendation is

submitted to the entire Medical Staff for approval.

In October 2005, plaintiff began again the process for review of his

medical staff privileges, seeking a change in the bylaws which would have

allowed oral and maxillofacial surgeons to become members of the Medical Staff

of WMC.  The application for a change in the Bylaws and appointment to the

4

Medical Staff was approved by the Credentials Committee, the Peer Review Committee and the Executive Committee.  In December 2005, the Executive Committee forwarded the proposed changes to the entire Medical Staff for review.   A meeting of the Medical Staff was set January 24, 2006 to vote on the proposed bylaw changes, but was cancelled January 18, 2006, by defendant Studer, the Chief of the Medical Staff, who announced the matter was instead being referred to the Medical Staff Development Committee, a committee of the Board of Directors of WMC.  Defendants assert the cancellation of the meeting was done upon recommendation of counsel, in an effort to avoid consideration of the issue by individuals who might be considered competitors of Dr. Ripley.

In February 2006, the Medical Staff Development Committee met and recommended to the Board that the application of plaintiff seeking to be a full member of the Medical Staff be denied.  Plaintiff alleges that the defendants have refused to provide him with a record of that meeting or the vote of its members.  Plaintiff alleges he has been informed that the Board subsequently met and accepted the recommendation of the Medical Staff Development Committee and that the defendants have voted to deny him Medical Staff privileges.

Plaintiff alleges that WMC's bylaws have been used selectively and

5

arbitrarily to exclude all oral and maxillofacial surgeons from competing for certain classes of patients with WMC's Medical Staff and other physicians, especially emergency trauma victims.   Plaintiff alleges WMC is in direct competition with him regarding the admitting of patients and is an essential facility under anti-trust laws in that it is necessary for plaintiff and others in his position to have access to the hospital to provide services as oral surgeons and that it is economically not feasible for him to duplicate the facility.

Plaintiff alleges that as a result of these actions he has lost numerous patients and has suffered damages.   The effect of this action by WMC is to restrain trade and commerce by lessening competition substantially in and associated with the availability of oral and maxillofacial services and that the public has been deprived of free and open competition in the foregoing trade and commerce.

Plaintiff in Count I asserts a restraint of trade/group boycott claim, alleging that the defendants, in violation of § 1 of the Sherman Act, combined and conspired to illegally boycott plaintiff and all oral and maxillofacial surgeons and others without M.D. or D.O. degrees and prevent them from attaining hospital staff privileges and providing services they are qualified by education and training to provide.   He alleges the defendants illegally agreed to arbitrarily

6

adopt requirements for admission to the active staff of WMC to exclude plaintiff and others with similar degrees from practicing at WMC and servicing patients in the Casper area, drafting the Medical Staff bylaws in a way to prevent him from practicing and servicing patients at WMC and intentionally restricting him from offering medical services similar to those offered by other competing providers, including WMC and causing him damages.

Count II alleges an illegal tying agreement in violation of the Sherman Act, asserting a combination or conspiracy in restraint of trade and commerce in tying the services of defendant WMC to individuals with M.D. and D.O. degrees with no reasonable basis and in unreasonably excluding plaintiff from providing oral and maxillofacial services at WMC.   Count III asserts an attempted monopolization claim, alleging the defendants intentionally and unlawfully joined with each other and others in preventing plaintiff from obtaining Medical Staff privileges and performing services at WMC, in violation of § 2 of the Sherman Act. The purpose and effect of the defendants' activities unreasonably  restrain interstate trade and competition in the line of commerce relating to the provision of oral and maxillofacial related services.   Plaintiff alleges the defendants are attempting to monopolize and have the market power to monopolize the market in Natrona County.

7

In their motion for summary judgment, the defendants assert that WMC and the physicians who hold privileges are governed by two separate sets of bylaws, the WMC board bylaws and the WMC Medical Staff bylaws which govern the conduct of Medical Staff members and non-physician "allied health professionals" providing patient care at WMC. The WMC Board of Trustees has ultimate authority on any bylaw changes, including eligibility for membership and privileges in the Medical Staff. Although previous Medical Staff bylaws allowed dentists and podiatrists to be considered part of the Medical Staff, their privileges were limited in that they were not allowed full admitting privileges or the ability to do history and physicals on patients. At WMC, these privileges are reserved for medical doctors or doctors of osteopathy.

The Medical Staff bylaws that apply in this case have qualification requirements for membership, which require the provider to be a physician. "Physician" is defined as a person holding an M.D. or D.O. degree. Pursuant to Board and Medical Staff bylaws, the Medical Staff is not a separate entity. It serves in an advisory capacity to the Board of Trustees.

Plaintiff is a dentist, with additional training in oral and maxillofacial surgery. His training does not confer a medical degree nor does he have a doctor of osteopathy degree. Plaintiff's license is issued through the Wyoming

8

Board of Dentistry and he is not regulated by the Wyoming Board of Medicine.

Plaintiff moved to Casper in 2003 and began practicing with two other oral surgeons, Drs. Pippen and Hageman.   Before he moved to Wyoming, plaintiff contends he always had unrestricted admitting privileges, including the ability to perform his own history and physicals on patients, including the sole discretion whether he needed to consult with another medical doctor.

WMC allowed plaintiff to apply for clinical privileges as an "allied health care professional," a designation for non-physicians providing services for patients at WMC.   He wrote on the application, in long hand, that he was applying for "Admission H&P's" privileges.  Plaintiff was granted all the surgical privileges he applied for but was not allowed to "Admit" patients without oversight from a physician member of the staff, and was precluded from doing his own history and physicals without a physician.  WMC contends that plaintiff ignored the limitations on his privileges and for several months, he admitted his own patients and performed his own history and physicals, until Dr. MacGuire, the Chief of Surgery, wrote him to point out that he was not a member of the Medical Staff and did not have admitting privileges.

Thereafter Dr. Ripley began writing letters, accusing Dr. MacGuire of wrongfully cancelling his privileges.  As noted earlier, Plaintiff disagreed with

9

WMC regarding his privileges and undertook efforts to seek changes in the bylaws so as to allow him membership and privileges equivalent to or on the same level as medical doctors. October 2004, Dr. John Barrasso, advised plaintiff that the Medical Staff was not interested in pursuing changes to the bylaws. A new chief of staff, Dr. Werner Studer, was lobbied by Dr. Ripley for the same changes about a year later. Dr. Studer and the committee agreed to put plaintiff's proposed bylaw changes to a vote of the Medical Staff. A meeting was scheduled for January 2006 to vote on the proposed bylaw changes, but in the interim period prior to the scheduled meeting, Dr. Studer sought the advice of the WMC counsel and its special health care counsel, Elise Brennan, from Tulsa, Oklahoma, as to whether, if the bylaw change occurred, Dr. Ripley would have to go through a re-credentialing process.

The advice of counsel was that it would be inappropriate to have the Medical Staff make the determination as to whether plaintiff and his status as an oral and maxillofacial surgeon should be allowed full Medical Staff membership and that it was an issue that should be considered by the Medical Staff Development ("MSD") Committee, That committee is composed of physicians and lay board members and is charged with determining those practitioners who should be entitled to privileges and Medical Staff membership

10

at WMC.

After debate, the MSD committee voted not to recommend any change to the bylaws.  The committee believed it would be better for patient care if there was physician oversight for oral surgeons such as plaintiff.  The hospital has the ability, through its "hospitalist program" to have twenty-four hour physician coverage, if plaintiff needed to admit any patients and have someone sign off on the history and physical.  This would also allow a medical doctor to manage any medical problems associated with plaintiff's patients, which may be more than jaw or maxillofacial problems.

There was substantial discussion regarding whether it would be appropriate to have a non-physician make medical determinations for co-morbidities, such as diabetes or other serious medical conditions.  The committee also confirmed that plaintiff was not being precluded in any way from performing the surgical privileges for which he had been credentialed and that he had not lost any patients because of the requirement to have a physician oversee his admissions and history and physicals.  The MSD chair, Diane Payne, was the only member supporting the bylaw change, and she believed there should be some type of "co-admitting" privilege which would permit plaintiff to co-admit patients as long as another physician co-signed his

11

admitting orders.

On February 8, 2006, the MSD committee made their recommendation to the full Board of Trustees. The WMC Board determined it would accept the MSD committee recommendation and that it would not change the bylaws. This decision was conveyed to plaintiff, but also advised him he was welcome to use the hospitalists to admit and perform H & Ps for his patients. Plaintiff was not willing to consider using the hospitalists to assist with his patients, even though he agreed it may actually provide some benefit to patient care. Plaintiff has asserted that he should have full discretion to admit patients on his own, to do his own history and physicals, and to make his own determination whether he needs to consult with other medical doctors to treat any other medical problems associated with patients. Plaintiff testified that whether this matter had gone through the MSD committee or a vote of the Medical Staff, if he had not been given the privileges he sought, he would have brought this suit in any event.

In the defendants' motion for summary judgment, defendants assert that the undisputed material facts demonstrate plaintiff is not able to establish an agreement among the defendants in violation of Section 1 of the Sherman Act. To prevail on a Section 1 claim under the Sherman Act, plaintiff must prove that the defendants (1) participated in an agreement that (2) unreasonably

12

restrained trade in the relevant market, citing <u>Reazin v. Blue Cross & Blue Shield of Kan., Inc.</u>, 899 F.2d 951, 959 (10th Cir. 1990).  There can be no liability absent an agreement to restrain trade.  A conspiracy involves two or more entities that previously pursued their own interests separately ... combining to act as one for their common benefit." <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 6218 (1984).  Defendants cite and rely on the Tenth Circuit's discussion of the Sherman Act's agreement requirement in <u>Abraham v. Inter-Mountain Health Care, Inc.</u>, 461 F.3d 1249 (10th Cir. 2006).  That case involved claims by plaintiff optometrists challenging a managed health care company's exclusion of optometrists from the network of providers.  Plaintiffs there introduced evidence that the defendant ophthalmologists had written numerous letters to the health care plan lobbying to retain the exclusion of optometrists from the network.  The court concluded that the fact that HIC's [the health care plan] decision not to panel optometrists because its ophthalmologists lobbied it for that decision does not indicate the HIC and ophthalmologists acted in concert within the meaning of § 1.

Liability only attaches to agreements designed unreasonably to restrain trade.  Defendants in this case argue that plaintiff can never show this Court

13

any admissible evidence of an implicit agreement with the purpose of improperly restricting competition.   Plaintiff must, to survive summary judgment, present evidence that tends to exclude the possibility that the alleged conspirators acted independently, or stated differently, that the alleged conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective.

Defendants argue there is no evidence of an agreement between the various defendants in this case to restrict competition.  Plaintiff has not been denied access to the hospital facilities and he has continued to perform all the surgeries associated with his specialty.   The MSD Committee's recommendations not to change the WMC bylaws and to retain admitting privileges only for M.D. or D.O. degree holders is consistent with a stated motivation to ensure that the required degree of medical competence is received by patients upon admission to WMC.  Defendants have also noted that none of the MSD Committee members were medical personnel in direct competition with plaintiff.  The Board of Trustees also acted properly when it declined plaintiff's request and voted in favor of the MSD Committee recommendation.   Plaintiff is unable to "exclude the possibility" that the defendants acted independently in making the decision at issue.   He has

admitted in his deposition that he assumes the existence of concerted action because he was denied admitting privileges. He has presented no evidence that shows he was denied admitting privileges based on an agreement among the defendants to restrain competition. Any party can act independently in furtherance of its own economic interests even to the detriment of competitors, violation violating the Sherman Act.

Alternatively, defendants argue that there is no dispute that granting admitting, history and physical privileges to M.D.s or D.O.s is not unreasonable. Defendants argue that the rule of reason analysis first requires a determination of whether the challenged restraint has a substantially adverse effect on competition. Plaintiff has testified that the policy of requiring a M.D. or D.O. for admission privileges has not prevented him from performing any procedures on patients at WMC. He testified in his deposition that he has voluntarily stopped doing procedures at WMC because he was angry at WMC over their policy and he refuses to give them any of his business. He testified that he was putting off all his patients that required surgery until the summer because "I'm not giving Wyoming Medical Center any elective dollars." Ripley Deposition at 125.

Defendants cite to Diaz v. Farley, 215 F.3d 1175, 1184 (10th Cir. 2000), which involved a group of anesthesiologists in Utah suing a hospital regarding

15

an exclusive contract for anesthesiology services.  That court stated:

> Finally, the fact that the conduct at issue in this case concerns decisions relating to health care presents a further reason why we should be cautious in applying a per se test.  Because agreements pertaining to the provision of health care services often raise issues of professional medical judgment, it is typically useful to apply a rule of reason approach.  Allegations of a concerted refusal to deal arise frequently in the health care industry.  Denial of hospital staff privileges is frequently alleged to be the product of a group boycott organized by competing health care providers.  In such cases, the courts have generally applied the rule of reason, holding that a hospital must be allowed, in conjunction with its medical staff, to exclude individual doctors on the basis of their lack of professional competence or unprofessional conduct.  Actions to enforce ethical rules by medical associations are also frequently alleged to constitute a group boycott.  Again, the courts generally apply the rule of reason, examining whether the rules serve a legitimate purpose in establishing professional standards of care without unduly limiting competition among providers.

Diaz, 215 F.3d at 1184.

Here, there are no material questions of fact that WMC's policy of restricting admission, history and physical privileges to those with M.D. or D.O. degrees does not have the kind of pernicious effect on competition and lack of any redeeming virtue necessary for implication of the per se rule.  Plaintiff must therefore demonstrate a material question of fact under the rule of reason test.

Under this approach, he bears the initial burden of showing that an agreement had a substantially adverse effect on competition.  Law v. NCAA, 134 F.3d 1010, 1019 (10th Cir. 1998).  If he does so, the burden shifts to the

16

defendant to come forward with evidence of the procompetitive virtues of the alleged wrongful conduct.    If the defendant is able to demonstrate procompetitive effects, plaintiff must then prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner.

Defendants contend the plaintiff cannot meet the initial burden of demonstrating a substantial adverse impact on competition.  It is undisputed that the policy applies equally to all oral and maxillofacial surgeons at WMC. WMC also has a physician on staff to assist in admitting professionals (the hospitalist). At no charge to the plaintiff or his patients, the hospitalist supplied by WMC will perform an admission history and physicals.  Plaintiff has testified that the admission privileges requirement has not prevented him from performing any procedures of his patients.    The only impact is his "unreasonable" decision to refuse to deal with WMC.

Further, defendants argue that the policy causes no actual harm to the consumers of health care services at WMC.  It is a policy specifically enacted to protect consumers and increase competition.  The policy allows a consumer to choose plaintiff Ripley to perform the specific procedure and to be ensured that any co-morbidity relative to the procedure is identified at no extra cost to

17

plaintiff.  Some patients with a multitude of other health related issues may prefer to have the procedure done by an M.D. or D.O. due to concerns over other health issues outside the realm of plaintiff's expertise.  By allowing plaintiff access to the hospitalist, the policy allows plaintiff more evenly to compete with these other physicians performing similar services but who have M.D. or D.O. degrees.

Defendants argue that the illegal tying agreement also fails as a matter of law.  He has not alleged two separate products that have been illegally tied together.  At best, plaintiff has alleged only one 'product" -- the product of admitting someone to WMC and performing a history and physical.  There is no second product tied to the provision of that service -- only a reasonable, objective and verifiable educational qualification required to be able to perform that service.  WMC's decision to limit privileges to M.D.s and D.O.s is a discretionary decision.  There are no facts supporting a contention that the defendants have tied provision of admitting privileges to any other product.

Defendants argue that the plaintiff's claim for Sherman Act § 2 violations also fails.  He must prove (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior

18

product, business acumen, or historic accident." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 (1985).   Assuming that the defendants possessed the requisite market power for purposes of this motion, defendants assert there are no material questions of fact regarding the valid business reasons justifying the defendants' policy.

Defendants argue that a corporation who possesses market power is under no duty to cooperate with its business rivals.   Even a company which possesses monopoly power and which refuses to enter into a joint operating agreement with a competitor or otherwise refuses to deal with a competitor in some manner does not violate Section 2 if valid business reasons exist for that refusal.   For the same reasons as urged with respect to plaintiff's illegal group boycott claim, defendants urge the Court to determine that plaintiff's claims of attempted monopolization also fail.   There are important and legitimate business reasons supporting the refusal to allow admitting privileges to non-M.D.s or D.O.s.   Defendants assert that the policy is designed to ensure the highest quality of services is available to all patients at WMC.   The policy does not restrict consumer access to oral and maxillofacial surgical services.   Plaintiff is able to provide all services to his patient-consumers at WMC; he just has to have the hospitalist perform the admission history and physical.   This

19

serves important and legitimate business purpose and benefits by making a better service available at WMC.

Plaintiff opposes the motion.  He argues that traditionally dentists who have a general office practice have not needed or utilized full membership on hospital staffs to practice and are therefore often relegated to the role of consulting physicians in a hospital setting.  Oral and maxillofacial surgeons have medical practices which require inpatient care and their training following dental school is much different than an ordinary dentist.  They treat injuries of the head and neck similar to and in competition with otolaryngologists and plastic surgeons.   Oral surgeons are members of hospital staffs with admitting privileges throughout the country.

Plaintiff testifies that in all other locales in Texas and Arizona where he has practiced he has been a full member of the hospital staff with admitting and H&P privileges.  He asserts other oral surgeons in Wyoming also have admitting and H&P privileges, noting that Dr. Rex Dolan, an oral surgeon in Cheyenne, is a member of the Cheyenne Regional Medical Center Medical Staff and is on track to become its chief of staff.  Plaintiff contends that when he raised the issue at WMC, the Executive Committee Medical Staff acknowledged that his request to be a full member of the Medical Staff was not unusual.  He asserts

20

that in the recent past, WMC treated oral surgeons as full members of the Medical Staff.  In 2000, WMC bylaws were changed, and for purposes of this suit, WMC has taken the position that those changes prohibit oral surgeons from being members of the Medical Staff.  Plaintiff argues the Medical Staff Bylaws are not clear in this regard and that there is no testimony that the changes were directed at oral surgeons.  He cites the statement of one physician stating that the new categories of allied health care providers was in conjunction with a chiropractor's attempt to gain admitting privileges at WMC.

For whatever reason, in 2000, the definition of physician in the WMC Medical Staff Bylaws was changed to include only individuals with an M.D. or D.O. degree; all dentists were placed in the category of "allied health professionals." The definition of "Medical Staff" in the Hospital and Medical Staff bylaws still includes "physicians, D.O.'s, D.D.S.s and podiatrists."  The Medical Staff Bylaws state that the qualifications for the Medical Staff do not include holding of any specific degree.[1]

After plaintiff moved to Casper in fall 2003, he was provided an application form to be used to seek privileges under the allied health professional category.  Allied health professionals are health care providers with

---

[1]Excerpts from the WMC Bylaws and Medical Staff Bylaws are set forth in Appendix A.

privileges at WMC but are not full members of the Medical Staff.  They are not automatically allowed to admit patients to WMC and their privileges may be terminated at any point by the hospital without a hearing.  They may be given clinical privileges at the discretion of the Staff and Board, pursuant to the Medical Staff Bylaws.

Plaintiff handwrote on his application, (the application form for allied health professionals), that he was requesting full admitting and history and physical privileges.  He was granted temporary privileges on November 21, 2003 as he had requested them.  December 8, 2003, the head of the WMC Credentials Committee wrote that he recommended plaintiff's privileges be allowed with conditions.   On December 11, 2003, plaintiff was granted temporary hospital privileges.  On the bottom of the page, an added statement was typed concerning conditions on his privileges:

> Condition from Credentials Committee: A physician member of the medical staff must either perform and document the pre-op H&P or document that they reviewed, approved and find Dr. Ripley's H&P acceptable prior to surgery.

Exhibit A, included in plaintiff's supporting materials at Document 38-2, page 11 of 28, states:

> With the Concurrence of the Department Chairman, the Chairman of the Credentials Committee; the President of the Medical Staff, and WMC President and CEO as attested below, this physician will

22

be granted temporary admitting and clinical privileges as follows:

> Department of: Surgery
> Specialty: Dentistry
> Temporary Privileges: 12/12/03 through 1/16/04
> Physician I.D. Number: ***
> Status: Temporary

Exhibit B, included in plaintiff's supporting materials at Document 38-2, page

12 of 28, appears to be the same document, but states:

> With the Concurrence of the Department Chairman, the Chairman
> of the Credentials Committee; the President of the Medical Staff,
> and WMC President and CEO as attested below, this physician will
> be granted temporary ~~admitting and~~ clinical privileges as follows:

> Department of: Surgery
> Specialty: Dentistry
> Temporary Privileges: 12/12/03 through 1/16/04
> Physician I.D. Number: ***
> Status: Temporary

It is not entirely clear why there are two different versions of this same

document granting plaintiff temporary privileges at WMC.  Plaintiff has denied

seeing the version of this document where the word "admitting" is stricken,

until this litigation, and argues that he had been granted full, unrestricted

privileges at WMC, including admitting privileges, which were summarily

withdrawn.  See e.g.. Ripley Affidavit, Document 38-2, at 10. However, both

copies of this document include the same added condition, requiring a physician

member perform the pre-op H&P or review and document plaintiff's H&P prior

to surgery.

Plaintiff did not agree with these H&P limitations and wrote a letter to Dr. Daniel Sullivan, Chairman of the Credentials Committee on December 15, 2003 objecting to the limitations. (Document 35-3, at 1). He indicated in that letter that he disagreed with the recommendation of the committee requiring another physician to countersign before any surgery performed by plaintiff. He argued that as an oral and maxillofacial surgeon he had received close medical training not obtained by all dental specialties and that it is well established throughout the country that admitting H&P privileges were granted to individuals with his training and qualifications. He urged the committee to reconsider his privilege request and sought an audience at the next executive committee meeting.

Ripley Deposition Exhibit 4, Document 35-2 at 43, is entitled "Wyoming Medical Center Reports/Recommendations/Actions on Appointment and Clinical Privileges." The form states that the application and privilege request of the above named allied health professional had been reviewed and considered. It recommended "AHP Membership" and that clinical privileges be approved as requested, except that the Credentials Committee approved the request with conditions. Thereafter, it appears that plaintiff exercised his privileges by working at WMC and admitting patients on his own. Plaintiff asserts in his

24

submissions that he believed privileges been approved as requested and

without conditions.  However, plaintiff's testimony discloses that he understood

there were limitations on his privileges to practice at WMC as an allied health

professional.  During his deposition the following discussion ensued:

> Q.   So just so I'm clear, you want the ability at the
> Wyoming Medical Center to be able, on your own, to
> order a chest x-ray, evaluate that chest x-ray for
> disease process or trauma and then make your own
> determination whether you need to bring in another
> M.D. to treat or not treat a potential chest injury.  Is
> that true?
>
> A.   That is true.
>
> Q.   Would the same be true, for example, potential injuries
> of the extremities?  You may or may not bring in an
> orthopedic consult based on your initial screening and
> exam?
>
> A.   Your question is not accurate.  It's not a question of
> whether I may or may not.  It's a question of whether
> I would or would not.  If there's an injury to an
> extremity and I recognize it, I will call an orthopedic
> surgeon.  If there is a rub in the pericardium when I'm
> listening to the chest, then my friend, Dr. Steplock, will
> get a call quickly to please come evaluate this man's
> chest and heart.
>
> Now, there's another issue here that I need to tell you.
> I am legally required to do the things I'm asking to do.
> My specialty, scope of specialty, requires that I be able
> to screen patients for trauma and evaluate patients for
> trauma and make the appropriate referrals.  That's
> part of my training.  And it has been my training since

1977.

Q.    And I take it your position is, Doctor, that you're
      entitled to do this medical trauma screening as well or
      better than, for instance, an internist or an emergency
      room physician or any other M.D.?

A.    I'm asking for admitting privileges and history and
      physical privileges that allow me to screen patients in
      an environment and get the consultations that are
      necessary to admit the patient.

             * * *

Q.    (By Mr. Ortiz) Doctor, before I forget, let me put in a
      couple other bits of documentation.  Do you remember
      receiving this letter from Kathy Drinnon regarding your
      privileges?  What is that, Exhibit Number 8?

A.    Sure.  Yes, I got this.

Q.    Did you, in fact, go talk to Susan Karavitis about the
      proper procedures you would utilize in setting up and
      taking patients through the surgical process at the
      hospital?

A.    Did I talk to Susan Karavitis?  This is Kathy Drinnon.

Q.    Well, I think that letter references you're supposed to
      see Susan, doesn't it?

A.    That's an orientation that we all do.

Q.    Did you go through that?

A.    Sure.  Yes, sir.

Q.    Did you discuss with Susan at that time any limitations

on your practice or privileges?

A.   I don't recall.  I don't know.

    * * *

Q.   (By Mr. Ortiz) And what I'll hand you as Exhibit Number 9, Doctor, do you remember writing this letter to Dr. Sullivan regarding concerns you had about the limitations on your privileges?

A.   Yes.  Sure.  This is a letter I wrote to him.

Q.   What prompted you to write that to Dr. Sullivan?

A.   I believe it was this Exhibit Number 8 and Exhibit Number 5.

Q.   Now, after you wrote this letter to Dr. Sullivan, did you obtain another physician to help you do or oversee your H and Ps and your admission to the hospital?

A.   Up until recently, I've never had another physician admit my patients.

Q.   Were you doing hospital procedures after you received your privileges, credentials?

A.   Yes, sir.  Sure.  Yes.

Q.   And did you then just choose to admit them and do the H and Ps on your own?

A.   No.  As a matter of fact, I relied on the document which is Exhibit Number 4 -- excuse me, Exhibit Number 2, which, if you go to the bottom of it, everything I asked for was approved.

Q.     So are you telling me, Doctor, that notwithstanding the references to limitations on your privileges, you chose to go ahead and do your own admissions and your own history and physicals without any physician oversight or review?

A.     That's what I did, yes, sir.

Q.     And, Doctor, I take it you did that knowing that that was directly contrary to the limitations placed on your privileges at the time?

A.     These limitations were under review and appeal.

Q.     Well, certainly no one had told you, we've changed our mind, Doctor. Go ahead and do your own admissions, your own history and physicals. You just did it on your own, didn't you?

A.     I had the granted privilege to do admission history and physicals. And that's what I relied on.

Q.     Is it your position, Doctor, that all the documents we've reviewed which indicate you had limitations on your admitting privileges and limitations on your ability to do history and physicals without physician oversight, is it your testimony that you somehow interpreted that to mean that you could do it all without physician oversight?

A.     I was admitting patients within the scope of my practice without physicians admitting my patients.

Q.     And you did that hoping they would change the rules. True?

A.     No, it wasn't wishful. It was an expectation that that was going to happen.

Q.    But at the time you were doing that, you knew you
      were violating the rules, didn't you?

A.    No.

* * *

Ripley deposition vol. 1, at 78-83.

On October 8, 2003, plaintiff wrote a letter to the Credentials Committee

addressing admissions H & P Privileges.  Document 35-2 at 46.  This letter from

Dr. Ripley states:

> This letter is written in anticipation of any issues pertaining to this
> request for H&P privileges.  I do not expect any but this is for
> purposes of reassurance to the medical staff that as a Board
> Certified Oral & Maxillofacial Surgeon my practice will be well
> defined within the envelope of that scope of practice.
>
> H&Ps, as practiced by me for the past 22 years, have been
> specifically NOT for the purpose of "practicing medicine".  I am
> compulsive in this activity and use them as a basis of determining
> the need for further medical consultation and management
> assistance.  My sphere is primarily in ASA I and II patients of the
> adolescent and adult populations.   I am very aggressive in
> consulting on any pediatric, geriatric or ASA II, III or above
> patients.  I frequently do "courtesy consults" to patients' primary
> physicians and will introduce and align myself with the entire
> medical community in all sub-specialty areas here in Casper.
>
> For reference, in addition to the full scope of office practice Oral &
> Maxillofacial Surgery, my practice has historically had a significant
> hospital census in areas of :
> *    H&N pathology/infections (non-oncologic)
> *    Facial Bone graft reconstruction (post-ablative
>      surgery)

29

- Orthognathic surgeries/reconstruction
- TMJ surgeries/reconstruction
- Craniofacial anomaly management/surgeries (as part of a comprehensive multi-specialty forum)
- H&N Trauma management

To conclude, thank you for reviewing this matter.  I assure you the request is appropriate, especially when considering my intended scope of practice.  Please contact me if there are any questions, concerns or if I may be of assistance along these lines.

I look forward to involving myself in this hospital community and beginning my practice associations with Drs. Pippen & Hageman.

On December 12, 2003, a Memo from Kathy Drinnon, the Credentialing

Coordinator for WMC, was sent to plaintiff.  This memo provided:

I have attached a copy of your temporary privilege notice, the privileges that have been approved for you and a section of bylaws that pertain to Allied Health Professionals.  Please let me or Susan Karavitis know if you have any questions.

I understand that you have scheduled a patient for surgery on Tuesday at noon and have already dictated a pre-op H&P using one of your partner's dictation number.  You have been issued your own dictation number which is 303.  Please use this number for all of your dictation.  This is necessary for the computer to electronically link you to your dictation.

Also, you need to make every effort to go through orientation with Susan Karavitis before surgery on Tuesday.  She can be reach[ed] at ... and is aware of your time constraints.  She's really the person who can help answer the questions that you've been asking of administration, and community development.

To reiterate what we discussed earlier on the phone, "a physician member of the medical staff must either perform and document the

pre-op H&P or document that they reviewed,  approved and find
Dr. Ripley's H&P acceptable prior to surgery."  I have enclosed a
phone list of our medical staff for your convenience.  You will need
to contact a physician on the list to fulfill this requirement.

Document 35-2 at 48.

Plaintiff wrote to Dr. Sullivan, the Chairman of the Credentialing

Committee on December 15, 2003.  That letter states, in part:

I would like to address the request for H&P privileges which you
forwarded, with the recommendation of the committee, as being
limited by requiring a physician counter-signature at my request of
the physician before any and each surgery.

I sort of understand the genesis of this recommendation as it was
first addressed in my career some > 22 years ago, right after
entering private practice in San Antonio, Texas. The issue, at the
time, was of not understanding the extent and training Oral and
Maxillofacial Surgeons have, as an integral part of their residencies,
in Physical Diagnosis with history and physicals on all of their in-
patients, reviewed by staff and medical staff when off rotation on
other medical services (ie cardiology, infectious diseases, internal
medicine, neurosurgery, plastic surgery, anesthesiology).

This is not to lessen the Specialty nature of all dental specialties in
any way.  However, none get the close medical training of my
specialty.  H&P privileges for Oral & Maxillofacial Surgeons is well
established throughout the country (including Wyoming), military
and federal services.

To get right to the point, I have never been denied H&P privileges
at any hospital to which I have applied for admitting and surgical
privileges.  I have practiced over 22 years, with 19 years being
Board Certified, in a practice limited to Oral & Maxillofacial Surgery.
During that time I have had a very respectable and complex scope
of practice, which continues to emphasize, pathology and severe

H&N infection patients, jaw/facial bone graft reconstruction, surgical management of TMJ patients, H&N trauma patients of major severity, advanced orthognathic reconstruction osteotomies and cancer reconstruction cases.

Through my career my H&Ps have never been found lacking or criticized and, in fact, have frequently been complimented as to their completeness and work-up.

Now please understand, I am not upset as to the Committee's recommendation.   In fact, as a new provider it is wholly appropriate to anticipate some scrutiny and assessment from the Credentials Committee.

I would like to suggest that the Committee be notified of a series of my first admissions so that the members of the committee, to their satisfaction, can review my patient work ups and specifically H&Ps.  It might well start with the patient now in-house.

Lastly, let me just mention that the by-laws, to my reading, specifically allow for H&P privileges for Oral Surgeons, in distinction from other dentists.  And both Drs. Pippen and Hageman have had H&P privileges without physician counter-signing requirements for over 150 years.  (Some levity is warranted.)

I am pretty well settled in Pippen's & Hageman's practice and anticipate a rapid increase in hospital cases, not the least of whom will be Maxillofacial Trauma patients.  It seems rather inconsistent that I should be credentialed to operate to the extent called for, yet not be considered adequately prepared to do the H&Ps required to admit them.

I trust you see this issue clearly.  I urge your committee to reconsider this privilege request.  And to expedite this, and in deference to time considerations to discuss this matter, I would appreciate an audience at the next Executive Committee meeting.

Document 35-3 at 1-2.

It appears that thereafter Dr. Ripley did admit many patients to the hospital and did H&Ps without consultation from any other member of the Medical Staff. Clearly, the above letter from Dr. Ripley recognized that there were limitations or conditions on his privileges. Notwithstanding these conditions, from December 2003 through August 2004, plaintiff admitted patients to the hospital and did H&Ps without consultation from any other member of the Medical Staff.

On August 5, 2004, Dr. Mary MacGuire, then the Chairman of the Surgery Department, wrote plaintiff:

> Thank you for bringing your concerns to me regarding your admitting privileges, specifically the restriction in the bylaws that limit admitting privileges to physicians who are members of the medical staff. Since you are currently categorized as an Allied Health Professional, you are not a member of the medical staff and do not have admitting privileges.
>
> We will start working on changing this regulation but this will take time because it involves many changes to the bylaws, rules and regulations, policies/procedures and will have to be approved by the Members of the Medical Staff, as well as the Board of Directors. In the meantime I ask that you have University of Wyoming Family Residency Program faculty admit any patients in your care to Wyoming Medical Center that don't have a member of the medical staff involved in their care for you.

Document 35-3 at 3.

Dr. Ripley then wrote Dr. Daniel Sullivan, Chairman of the Credentialing

33

Committee on August 9, 2004.  His letter states:

> Per our recent discussions last Friday, you realized the importance
> and significance of the August 5, 2004 letter from Dr. MacGuire
> canceling my admitting privileges at WMC.
>
> A few points need to be made here at the outset:
> - It is not true, as indicated in her letter, that I brought this issue to
>   her attention.  Why would I?  I was, in fact, ambushed with this
>   issue in medical records while signing my charts, eg. Admission
>   orders, H&Ps, Op. reports and D/C Summaries!
> - I have no problems having my privileges reviewed or re-assessed.
>   That's appropriate for all providers.  But there is a format for doing
>   that.
> - There is no issue here of incompetence or risk to patients.   A
>   summary suspension of a GIVEN PRIVILEGE because of some
>   confusion on the part of one or two people is extremely to the left
>   of wrong.
> - This action was not done with ANY consultation with me, the
>   Credentials Committee, or any entity within the established
>   administrative structure of this hospital.
> - You know, because you were intimately involved in the whole issue
>   and process of my obtaining Admitting privileges from the outset,
>   that my attempt was to openly anticipate this issue and document
>   the privilege justification from before stage one of the application
>   process. You also realized that the documentation required was
>   deficient for Oral Surgeons to obtain admitting privileges as Allied
>   Health Professional by being clumped together as "Dentist", a
>   distinction of which I am very proud.
> - This matter has already been before the Hospital Board.  There is
>   no confusion as to the granting of my Admitting Privileges.  There
>   is, on the other hand, an intentional unwillingness to reconsider this
>   issue through the proper channels in the proper way.
> - There is a blatant failure to recognize the significance of my
>   participation in assisting this Hospital in maintaining a Maxillofacial
>   Trauma service over the last several months.  Why would anyone
>   hamstring my ability to continue providing that service?

In conclusion, this issue needs a <u>quick fix</u>.  The abuse of
process MUST be corrected.

Document 35-3 at 4-5.

August 12, 2004, Dr. MacGuire wrote Dr. Sullivan:

I will begin by apologizing for the explosion generated by my
attempt to rectify what I was told was a paperwork problem.  When
I asked Dr. Ripley to have his charts co-signed I was told that the
board had previously issued an edict that Allied Health Personnel
could not serve as the admitting physician in the hospital.

I asked Dr. Ripley to obtain a co-signature from one of his co-
workers in what I expected to be the couple of weeks interval while
we straightened this out and explained to him that this was in no
way any attempt to remove or abrogate his privileges but was
simply an attempt to rectify any paperwork problems we might
have.

However, in the explosion that this has generated, I believe there
is some light.

I signed Dr. Ripley's privileges in January of 2004 advocating
admission H&P privileges for him.  Since the response to my letter
to him, I've had a chance to think about this a little bit more.  Dr.
Ripley has certainly provided wonderful service to the hospital in
the sense that he has provided maxillofacial coverage when no one
else was willing to do so.  This is truly a thankless job.  However,
many of these patients are maxillofacial trauma patients because
they have abused drugs and alcohol and many of them have
complex medical problems.  Dr. Ripley is by all accounts an
excellent oral surgeon, but he is not a physician.  He does not have
the training to manage or possibly even appreciate some of the
problems these patients have.

In thinking about the potential complexity of these patients and the
risk posed both to the hospital and to the other medical staff who

35

may ultimately end up involved in these patients if there is an acute medical problem, I think that it is best to recommend to all the parties involved in credentialing, that Dr. Ripley continue to provide care to patients in conjunction with a member of the medical staff who is the admitting physician of record. Dr. Ripley is working with Community Health Center of Central Wyoming and this would provide a ready avenue of collaboration in the care for these patient's other complicated problems without creating an undue burden for either Dr. Ripley, the patients or all the other members of the medical staff. Multiple Trauma patients must of course always be admitted by a general surgeon, with other consultations as appropriate.

It is my recommendation as the Chairman of the Surgery Department that this issue be discussed again in the appropriate committees with of course Dr. Ripley's attendance and input. I think that there needs to be careful consideration of what is the best course for all involved and in my opinion that is to provide consultation services by Dr. Ripley for patients who require hospital admission.

Thank you very much for your time and attention, and again my apology for lighting the match to this explosion. I hope that in the end, it works to the benefit of all.

Document 35-3, at 6-7.

October 25, 2004, Dr. Ripley wrote Dr. John Barrasso, then-Chief of Staff

of WMC. That letter states:

Let me apologize for being the center of controversy as relates to my Admitting Privileges at Wyoming Medical Center. As you know, because you were personally involved in my credentialing process, this was a privilege request I made in the open with full disclosure of my intentions to admit patients and with a preliminary letter anticipating and hopefully preventing any controversy.

36

When privileges were first granted with restrictions as to my ability to admit patients, I courteously and fully justified a reconsideration request of the Credentials Committee.   This was favorably considered and forwarded through Executive Committee with approval by the Hospital Board with your support and that of many others.  Thank you.

At that time, it was fully understood that the wording of the By-Laws would need to be addressed.  It was my offer, at that time, to assist in that by-laws change process when necessary but that I had received the admitting privilege I needed to practice my specialty.   It behooves everyone to review the documents I submitted throughout the credentialing process. It is patently false that there was any confusion as to the request or that I was simply asking to be able to do H&Ps on my patients or that there was some distinction to be made between H&P and ADMITTING H&P privileges.  Please reference my letter of 12/15/03 to Dr. Dan Sullivan wherein I was asking for a reconsideration of this issue. It is unambiguous and clear as to the necessity of admitting privileges for which I was applying.

It wasn't my call in the first place to effect a change in the wording of the By-Laws after the Admitting H&P privileges were granted and the issue never surfaced until some 3 months ago when I was literally ambushed in the records room while signing several charts of patients whom I had admitted/treated!!!!!!!   I have been admitting patients to this Hospital with full knowledge of all that I had the privilege and that I was performing well and in good service to the patients of this community and region, for the previous > 8-9 months!

Now it turns out, this matter was NEVER discussed with me, EVER, or in any Credentials Committee Forum, Executive Committee Forum, or with the Board of this Hospital.  The letter I  received from Dr. Mary MacGuire is without authority and outside of her role as Head of the Surgery Department.  There is not one element of less than excellent care or risk to a patient, provider competence or impairment at play here.  Mary MacGuire does not have the

37

authority to Summarily Suspend my <u>given privileges to admit patients to this hospital.</u>

Significantly, though I have no problems with my activities being scrutinized, as I have expressed many times, there are provisions in the By-Laws as to how this is to be done. The rules are common to all hospital By-Laws and mandated by JCAHO, the HCQOA '86, subsequent revisions and case law. Specifically, they call is for an <u>objective and confidential process.</u> Dr. MacGuire has taken on a public "whisper" campaign through the hospital and doctors' lounge to openly discuss and recruit others to her position on this matter. Dr. MacGuire has also placed in various committee minutes, in my absence, the notion that my activities have placed the Hospital at risk. That is profoundly not true. Her actions in this matter have, not mine.

Now John, the Hospital needs to get this right and it needs to get this right ....right now. It has been suggested that "now is not the time to address this problem"; that other issues may be of higher priority. I have been very patient while this political groundswell continues to no personal gain. Or, it has been suggested that they are "not going to change the By-Laws for just one person". Well,,,,,,, as has been previously acknowledged, yes you will. My Specialty won't stand for less. My ability to practice my Specialty should not be held in abeyance while a lengthy By-Law change process, which as yet has not even begun, drags on.

My insistence on a rapid resolution to my unquestioned previous admitting privilege status is warranted, and here's why. MFT is MFT and as such is seldom truly life threatening. Not so with severe H&N infections. It can be anticipated that I will admit a patient soon for an advancing cellulitis of the head & neck, for which Oral & Maxillofacial surgery is the specialty of priority to manage. This will precipitate an adamant response if my existing privilege to admit such a patient, whether child or adult, whether Title XIX, non-funded or fully insured, is challenged or not facilitated.

38

I have stated, since prior to being licensed in this state, that I would be "part of the solutions to, not the source of, problems". I redundantly repeat again, this an issue I specifically addressed and attempted to avoid from the outset. I am currently anticipating completion of the "probationary" period of hospital privileges in the month of November and then naturally progressing to Active Staff. Even though this letter is submitted at some personal risk, this will not politically hand cuff my insistence that this matter be resolved expeditiously. Further, this controversy shall not impact that progression.

There is need for additional perspective. Please have the Board consider the following:

- Every other Oral & Maxillofacial Surgeon in this State, but for one whom I have not confirmed, as <u>ADMITTING PRIVILEGES</u> at their respective hospitals
- The two other Oral & Maxillofacial Surgeons in Casper had admitting privileges. I know because this was discussed during my credentialing process. Why they weren't "grandfathered in" needs explaination [sic].
- WMC By-Laws on this matter are not in compliance with JCAHO standards
- WMC By-Laws on this matter are not in compliance with the national standards on this issue

I would be disingenuous if I were to no offer a common sense way out of this predicament that Dr. MacGuire has initiated. John, no By-Law is intended to be <u>crippling</u> to the proper function of the Hospital and staff in meeting the service needs of patients, locally or regionally. This Hospital Board, on recommendation from the medical staff, can and should act to correct this blatant unintended consequence. I am aware of the historical "reasoning" from which the By-Law wording was changed some 4-5 years ago, giving Admitting Privileges to only MDs and DOs (while at the same time allowing <u>policy</u> exception for Oral Surgeons). Oral & Maxillofacial Surgery is a universally respected TRADITIONAL specialty, not coincident with the concerns held then for non-traditional providers seeking admitting privileges to WMC. The Hospital has known of

the need for this By-Law wording correction for a long time. A simple statement or "exception" for Oral & Maxillofacial Surgeons is appropriate. This can/should be done rapidly.

In conjunction with this and in response to this matter, I am making a formal complaint to the Executive Committee and Board of this Hospital as to the inappropriate abuse of process and flagrant manner in which Dr. Mary MacGuire has singularly interfered with the vital functions of this hospital, improperly impinged on my privileges granted by the WMC Board and interfered with my abilities to practice within the full scope of my specialty. She has further done this outside of her authority on the medical staff and with no regard for common professional courtesies or the privacy concerns MANDATED within the By-laws and federal law.

Which brings me to the final succinct issue here. I never have, nor will I ever, accept a secondary provider status at WMC or any other facility. Neither would you, John. My education, training, experience and clinical history warrant the consideration generally accepted for my Specialty throughout the medical/dental community, worldwide. Only WMC is out of step on this issue. I expect the By-laws change process to begin immediately. I understand that is not now happening. I expect to be involved in that process. That certain is not now happening.

Thank you again for your assistance, John.

You seem to thrive in political/controversial arenas, but with the acknowledged intent to better a situation. I did not seek this challenge for you.

Document 35-3 at 8-11. This letter was copied to Mike Reed, Chairman of the

Board of WMC; Pam Fulks, CEO of WMC; Governor Freudenthal; every member

of the WMC Medical Staff; and Dr. Grant Christianson, State Dental Health

Officer.

Dr. Barrasso responded on October 27, 2004:

We appreciate your interest in caring for patients at Wyoming Medical Center and hope that you will continue to provide specialty care within the scope of your privileges. Good quality practitioners are a valuable asset to this community and we are hopeful that we can retain your specialty services in our hospital.

The Medical Staff Executive Committee discussed your request for admitting privileges at their October 12, 2004 meeting. They agreed that the intent of Medical Staff Bylaws, 3.1 clearly addresses your question. "No physician, including those in a medical administrative position by virtue of a contract with the Hospital, shall admit or provide medical or health-related services to patients in the Hospital unless he or she is a member of the Medical Staff....." Physicians are defined in Bylaws 1.12 as "...any individuals with an MD or DO degree who are fully licensed by the Wyoming State Board of Medicine to practice medicine or osteopathy in the State of Wyoming.

The issue that you raised about admitting privileges is important and would require a major change to the Bylaws. The Executive Committee does not want to pursue this.

The Executive Committee is in agreement that each Wyoming Medical Center inpatient should have an attending physician. Specialists, like yourself, should be brought in at the appropriate time by the attending physician to manage the area of their specialty. Any patients you want to bring in for surgery would need to be admitted by a staff physician.

I am truly sorry that our communication about your privileges to do H&Ps was not more clear from the beginning. You were granted privileges to do H&Ps but were never given admitting privileges. I hope this letter answers your question.

41

Document 35-3 at 12.

As mentioned in some of the correspondence, at the time this flurry of

letters was being issued, Dr. Ripley was also employed with Community Health

Center of Central Wyoming, Inc.  On November 2, 2004, Beth Eveland wrote

the following Memo to plaintiff Ripley:

> I was mortified to discover the letter dated October 25, 2004,
> which was placed in my mailbox on October 27 or 28, 2004.  This
> letter was sent <u>without</u> either my authorization or prior
> acknowledgment.  Many dignitaries received this correspondence.
> Your actions are unacceptable and unprofessional.
>
> This, especially, has been an insult since just five - six weeks ago
> we met to discuss the matter of the content of this particular letter.
> It was explained to you then that <u>NO</u> such congruity was to be
> communicated without my approval first.  In addition, Dr. Marty
> Ellbogen has conversed with you in respect to the subject.  You
> were asked to be patient at that time.  You agreed that you would
> be and this would be allowed to "rest" for now.
>
> You disregarded both my directive and the advise [sic] from Dr.
> Ellbogen.   This  act  of  insubordination  has  caused  an
> embarrassment to the entire CHCCW organization, including our
> Board of Directors.
>
> I am requiring you to apologize, in person, to Mary MacGuire, MD,
> John Barrasso, MC and Pam Fulks, CEO of WMC.  Further, you will
> write a letter of apology to the aforementioned persons as well as
> to Mr. Mike Reed, Governor Dave Freudenthal, Dr. Grant
> Christianson, CHCCW Board Chair (Shawn Bassham), and every
> member of WMC Staff.  This is to be completed by November 3,
> 2004.  I will review these letters <u>before</u> they are sent out.
>
> Failure to follow this order will result in immediate termination of

your employment.

Document 35-3 at 13.

Dr. Ripley's employment at Community Health continued for a period of time thereafter.   However, his employment at Community Health was terminated and plaintiff opines that the activities outlined above were a major part of why he was fired, although there were other reasons including matters Ripley had turned over to the State Board of Dental Examiners regarding Lowell Dawson, who ran the clinic at Community Health.  Ripley deposition at 116-117.

Minutes of the Credentials Committee from October 24, 2005 indicate that Ripley had requested admitting privileges.  Exhibit 4 to plaintiff's opposition states in part:

> ...The committee noted that the American Board of Oral and Maxillofacial Surgery and the American Association of Oral and Maxillofacial Surgeons state that oral and maxillofacial surgeons can be treated as a surgeon who admits a patient, completes a history and physical exam, and consults with a specialist/PCP if the need arises. Also noted per the Clinical Privilege White Papers that "core privileges in oral and maxillofacial surgery include admission, work-up, and the performance of surgical procedures on patients presenting with illnesses, injuries, and disorders of both the functional and esthetic aspects of the hard and soft tissues of the oral and maxillofacial regions". Dr. Swedberg would like to review the admission privileges of other Allied Health Providers.
>
> Recommendations: Dr. Swedberg and Ms. DeCook will review the WMC bylaws regarding all Allied Health Practitioner's admission privileges.

43

Action: This information will be reviewed at the next Credentials
Committee Meeting.

Minutes from the Executive Committee of November 2, 2005 (Exhibit 1 to

plaintiff's opposition) state:

Oral & Maxillofacial Surgeon Admitting Privileges;
Dr. Ripley presented background information about the Oral &
Maxillofacial Surgical specialty and a history of the privileges that
he has had at other hospitals. He proposed a bylaws amendment
to include qualified Oral & Maxillofacial Surgeons on the Medical
Staff.     Dr. Ripley noted that his specialty training is not
appropriately categorized as an allied health practitioner. There
was discussion about getting consultations when appropriate. Dr.
Ripley said patient care would be improved if he had admitting
privileges without limitation or restriction.

Dr. Ripley left at this time.

Discussion ensued. Members agreed that it is traditional for Oral
& Maxillofacial Surgeons to be a part of the Medical Staff in the
same category as physicians. Admitting patients and getting
consultations as appropriate are privileges that Oral Surgeons
traditionally have been given. There was discussion about Board
Eligible/Board Certified requirement.      It was suggested that
patients with medical problems would need consults. Members
agreed that getting consults as appropriate is expected of all
members of the medical staff. Members agreed that the Bylaws
should be amended to include Oral & Maxillofacial Surgeons as
members of the medical staff with admitting privileges without
limitation or restriction.       Members asked that the Bylaws
amendment be posted a month in advance of a January General
Staff Meeting.

ACTION: Draft Bylaws amendment to include qualified Oral &
Maxillofacial Surgeons as members of the medical staff with
admitting privileges without limitation or restriction.

44

Plaintiff's opposition Exhibit 1, Document 38-2 at 2-3

A General Staff Meeting that had been scheduled for January 24, 2006,

to discuss these proposed changes was canceled.   Plaintiff's opposition at

Exhibit 5; Document 38-2 at 14.  Dr. Studer, then Chief of Staff, cancelled the

meeting after consulting with counsel.

There is a letter from Dr. Mary B. Weber, M.D., dated January 27, 2006,

expressing opposition to changing the composition of the Medical Staff.  She

states:

> I am opposed to changing the composition of the medical
> staff.  If non-physicians already fit into a category which enables
> them to carry out the procedures for which they have been trained,
> there is no good reason to change the bylaws.  With the family
> practice residency program and hospitalists to admit patients, there
> is no need for a non-physician to be able to admit patients.
>
> In fact, there are some good reasons to keep the medical
> staff limited to physicians.  First, if you allow some non-physician
> doctors to be full members of the medical staff, how will you deal
> with doctors of chiropractic, homeopathy, acupuncture or other
> fields who wish to join the medical staff and admit patients?
> Second, as an anesthesiologist, I am reluctant to anesthetize a
> patient and then turn the patient's care over to a non-physician
> when the patient leaves the recovery room.  Granted, we do
> anesthetize patients for dentists and podiatrists at the surgical
> center, but keep in mind that we supervise these carefully selected
> patients from the time of their pre-operative evaluation to their
> discharge from the surgical center.  A hospital patient turned over
> to a non-physician would have the benefit of a physician medical
> director which the surgery center has at all times.  How can a non-
> physician be qualified to treat patients with diabetes, hypertension,

45

heart disease and the other myriad medical conditions which beset our patients? The argument that some specialized surgeons do not routinely treat these conditions and therefore one does not need to be able to treat these conditions is specious. Orthopedic surgeons did graduate from medical school and they have been trained to recognize when a patient's medical condition is out of their expertise. Not knowing what you don't know is the most dangerous situation.

Please use common sense and keep the medical staff composition as it currently is. Anybody who has a burning desire to join the medical staff of WMC can do it the way we all did -- attend medical school. Thank you for your careful attention to this important matter.

Document 38-2 at 20.

Minutes of the Medical Staff Development Committee from February 6,

2006, also addressed the issues that had been raised by Ripley.

Ms. Payne informed committee members that Dr. Ripley asked for an opportunity to explain his specialty, oral Maxillofacial Surgery, and answer any questions. She said that Dr. Ripley asked Dr. Anderson to recuse himself. Although no conflict of interest was identified, Dr. Anderson asked to be excused.

Dr. Anderson left at this time and Dr. Ripley came into the room. Dr. Ripley said that he wanted to answer questions the committee might have about his specialty of oral maxillofacial surgery. He did indicate that he has been granted all of the clinical privileges as an allied health provider which he has requested and which are required in order to take care of his patients, but does not have admitting privileges. Dr. Ripley explained his training to perform History and Physical exams. Dr. Ripley said at other hospitals he had unrestricted admitting privileges and if a patient he admitting needed a consult, he ordered the consult. Dr. Ripley reported that at WMC if a patient needs surgical management of a head/neck

infection, or any ASA I trauma, a physician member of the medical staff must be called to admit the patient.  His position is that this causes the patient an additional charge, causes the physician additional liability, and delays treatment.  He stated the bylaws should be changed so that oral maxillofacial Surgeons are members of the Medical Staff, and can therefore admit patients without restriction.

Members questioned Dr. Ripley.  He said he wants the decision to be made without political barriers.  Dr. Ripley told members that all other OMS in the state have admitting privileges: Noland Gustafson in Cheyenne, Miller and Stern in Jackson, one in Gillette and Sheridan.  One member asked Dr. Ripley if he lacked any privilege for taking care of his patients other than admitting privileges.  Dr. Ripley said he had every privilege he had requested, except admitting patients.  Dr. Ripley said if granted admitting privileges he will have the ENT physicians cover for him.  Dr. Ripley also indicated that he had not lost any potential patients as a result of his current status.  Dr. Ripley left the room and Dr. Anderson returned at this time.

Discussion ensued.  Mr. Williams presented a copy of the State Department of Health regulations regarding a dentist's hospital privileges.  He said that the State interprets the regulations to allow hospitals to determine the scope of privileges extended to oral maxillofacial surgeons. The State does require that a physician must manage any dental patients with who [sic] have medical problems.  Members agreed that having a hospitalist or primary care provider do the H&P would not be an additional cost to the patient, or liability for the physician or delay in treatment.  Members agreed that changing the medical staff composition to include Oral Maxillofacial Surgeons does not provide an improvement in patient care.  It was suggested that OMS privileges at the hospital in Cheyenne be reviewed.

RECOMMENDATION: Recommend no change to the medical staff composition, based on the following conclusions:
- There are appropriately trained and credentialized

> primary care physicians available to admit patients
> - Admission by a primary care physician does not increase the cost to the patient or delay the treatment
> - Changing the composition of the medical staff to include Oral Maxillofacial Surgeons does not provide an increase or improvement in available patient care

ACTION: It was moved, seconded and approved to recommend no change to the medical staff composition.  One vote opposed. Dr. Anderson abstained.

ACTION: The oral maxillofacial surgery privileges at the hospitals in Jackson, Cheyenne, Gillette, and Sheridan will be reviewed.

Document 35-4 at 17-24.

The Board of Directors of WMC held a meeting February 8, 2006.  The minutes reflect issues  with respect to the Medical Staff Development Committee, in part:

> Steve Chadderon reported that Dr. Jim Ripley, DDS attended the MSD meeting to request a change to the Medical Staff categories to allow non-physician maxillofacial surgeons to become members of the Medical Staff, which would result in them having admitting privileges.  The MSD committee's recommendation to the Board of Directors is to make no change to the Medical Staff categories. Documentation from Dr. Ripley was distributed.

> Drs. Anderson, Bailey and Cunningham all declared a conflict of interest on this issue.  Lengthy discussion was held.

> On a motion from Steve Chadderdon with support from Ken Eickhoff, the Board voted unanimously to make no change to the Medical Staff categories.

Document 38-1 at 15-18.

48

After Dr. Ripley's attempts to effect a change in the pertinent bylaws was unsuccessful, he filed this action.

The relevant bylaws for WMC Center are included in the record attached to the Affidavit of Dick Williams as Exhibit A (Document 35-5, at 17); the relevant WMC Medical Staff Bylaws are also included, attached to the Williams Affidavit as Exhibit B (Document 35-5 at 47).

Plaintiff opposes the motion for summary judgment on the anti-trust claims.  He argues that disputed material facts demonstrate that plaintiff can establish an agreement between the defendants in violation of Section 1 of the Sherman Act, that disputed material facts regarding whether the granting of admitting, history and physical privileges to M.D.s or D.O.s is unreasonable, that there are questions of fact as to whether the defendants entered into an illegal tying agreement, and that there is sufficient evidence to allow his Section 2 Sherman Act claim to proceed to a jury for decision.

**Standard of Review**
**Rule 56 Motions for Summary Judgment**

Under Rule 56, the district court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

49

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When the moving party identifies evidence that demonstrates no genuine issue of material fact remains, the nonmoving party must go beyond the pleadings and present to the court the specific evidence that indicates a genuine factual issue for trial. City of Chanute, Kansas v. Williams Natural Gas Co., 955 F.2d 641, (10th Cir. 1992), cert denied  113 S.Ct. 96 (1992), *overruled in part by* Systemcare, Inc. v. Wang Laboratories Corp., 117 F.3d 1137 (10th Cir. 1997)(as to Section 1 Sherman Act claims). The existence of some disputed facts does not automatically preclude summary judgment. Id., citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). If the nonmoving party does not make a sufficient showing of a material fact, all other facts are rendered immaterial and summary judgment is appropriate. Id., citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

This Court must also recognize that the prevailing sentiment is that summary judgment should be used sparingly in antitrust cases and is disfavored. Id., citing Fortner Enters., Inc. v. United States Steel Corp., 394 U.S. 495, 505, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969) and Poller v.

<u>Columbia Broadcasting Sys., Inc.</u>, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458

(1962).  See also <u>Sports Racing Services, Inc. v. Sports Car Club of America,</u>

<u>Inc.</u>, 131 F.3d 874, 882 (10th Cir. 1997).

However, more recently, the Tenth Circuit has offered the following with

respect to the applicable standard to apply in antitrust cases, from <u>Abraham v.</u>

<u>Intermountain Health Care, Inc.</u>, 461 F.3d 1249, 1257-1258 (10th Cir. (2006):

> Although the traditional summary judgment standard applies to antitrust cases, the analysis is altered somewhat when -- as is the situation here -- the plaintiff relies solely on circumstantial evidence to prove concerted action. See <u>Rossi v. Standard Roofing, Inc.</u>, 156 F.3d 452, 465 (3d Cir. 1998).  In that case, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  <u>Id.</u>  Accordingly, to survive summary judgment, a plaintiff must present "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." <u>Id.</u> (quoting <u>Monsanto</u>, 465 U.S. at 764, 104 S.Ct. 1464); <u>Reazin v. Blue Cross & Blue Shield of Kan.</u>, 899 F.2d 951, 963 (10th Cir. 1990).  That is, the antitrust plaintiff must present evidence that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." <u>Monsanto</u>, 465 U.S. at 764, 104 S.Ct. 1464 (quotation omitted).

As the Third Circuit has explained:

> The Supreme Court's concerns about permitting the inference of a conspiracy from ambiguous circumstantial evidence in the antitrust context stem from its conclusion that mistakes by an overzealous

judiciary would be "especially costly ... chill[ing] the very conduct the antitrust laws are designed to protect." Matsushita, 475 U.S. at 594, 106 S.Ct. 1348; Monsanto, 465 U.S. at 763, 104 S.Ct. 1464; Big Apple BMW [v. BMW of North America, Inc.], 974 F.2d [1358,] 1363 [(3rd Cir.1992)] ("Care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not infringe upon defendant's freedom, so long as it acts independently, to refuse to deal.") (citing Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). For this reason, the plausibility of an antitrust plaintiff's claim is important. "[I]f the factual context renders [the plaintiff's] claim implausible -- if the claim is one that simply makes no economic sense -- [a plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (citations omitted). Relatedly, in evaluating whether a genuine issue for trial exists, the antitrust defendants' economic motive is highly relevant. "[I]f [the defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." Id. at 596, 106 S.Ct. 1348. Moreover, even with a plausible motive to conspire, ambiguous conduct will not create a triable issue of fact with respect to the existence of a conspiracy. See id. at 597 n. 21, 106 S.Ct. 1348.

Rossi, 156 F.3d at 466.

## Discussion

In Count I, the plaintiff has alleged the defendants "combined and conspired to illegally boycott plaintiff and all oral and maxillofacial surgeons and

others without M.D. or D.O. degrees and prevent them from attaining hospital

staff privileges and providing services which they are qualified by education and

training to provide," in violation of Section 1 of the Sherman Act, 15 U.S.C. §

1.  This claim is analogous to that group boycott claim asserted by the plaintiff

optometrists in Abraham v. Intermountain Health Care Inc., 461 F.3d 1249.

The Tenth Circuit stated, with respect to this claim, the following:

> A. Group Boycott
>
> Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal."  15 U.S.C. § 1.  A conspiracy involves "two or more entities that previously pursued their own interests separately ... combining to act as one for their common benefit." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).  When two formerly separate entities combine for their common benefit, their activity is "fraught with anti-competitive risk" because it "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands."  Id. at 768-69, 104 S.Ct. 2731.  On the other hand, "unilateral conduct, regardless of its anti-competitive effects, is not prohibited" by § 1 of the Sherman Act.  Motive Parts Warehouse v. Facet Enter., 774 F.2d 380, 386 (10th Cir. 1985).  It is therefore critical to distinguish between unilateral and concerted action in proving a violation of § 1.
>
> The heart of the Plaintiffs' § 1 claim is that IHC, at the behest of several of its panel ophthalmologists -- including Drs. Miller and Brodstein -- unlawfully excluded optometrists from its provider panels, and that this exclusion injured both competition, generally, and the Plaintiffs, specifically.   Of course, if IHC acted independently in excluding optometrists, IHC would not be liable

under § 1.  See <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) ("A manufacturer ... generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); <u>United States v. Colgate & Co.</u>, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).  Such is the case "[e]ven where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have." <u>Fisher v. City of Berkeley</u>, 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986).  There is also no dispute that if panel ophthalmologists conspired with each other and then with IHC to restrain trade, then such conduct is actionable under § 1.  See <u>Todorov v. DCH Healthcare Auth.</u>, 921 F.2d 1438, 1455 (11th Cir. 1991) (hospital and medical staff are separate legal entities capable of conspiring with each other); <u>Cooper v. Forsyth County Hosp. Auth., Inc.</u>, 789 F.2d 278, 282 (4th Cir. 1986) (Motz, J., concurring) ("Section 1 of the Sherman Act clearly prohibits members of a medical-dental staff from agreeing with one another to coerce a hospital's trustees to deny privileges to members of a competing profession for the purpose of furthering their economic self-interest.").   In this way, "[l]iability will only attach to agreements designed unreasonably to restrain trade." <u>Todorov</u>, 921 F.2d at 1455.  The question before us is whether there is sufficient evidence of such an agreement between IHC and its panel ophthalmologists to survive summary judgment.

<u>Abraham</u>, 461 F.3d at 1256-1257.

Section 1 of the Sherman Act requires the existence of an agreement which unreasonably restrained trade in the relevant market.   <u>Reazin v. Blue Cross and Blue Shield of Kansas, Inc.</u>, 899 F.2d 951, 959 (10th Cir. 1990).  The challenged agreement need not be in writing or even be explicit. "'[C]onspiratorial conduct may be established by circumstantial evidence.'" <u>Id.</u> at 963.  A plaintiff seeking damages for violation of § 1 must present evidence

that 'tends to exclude the possibility' that the alleged conspirators acted independently.'" Id.   An additional element that is essential in a Section 1 case is the existence of an "unreasonable restraint of trade."  Id.  at 965.

Upon review of the materials in this case, the Court concludes that there is no evidence of any agreement that fits within the contours of the applicable law regarding Section 1 of the Sherman Act.  There is no admissible evidence of any agreement whatsoever, implicit or explicit, that has the express purpose of unreasonably and improperly restraining trade and competition.  There is no evidence that the defendants, the alleged conspirators, had any conscious commitment to a common scheme designed to achieve an unlawful objective.  There is no evidence at all in this case that suggests an agreement designed to coerce the appropriate decisionmakers to deny privileges to members of a competing profession for the purpose of furthering their economic self interest.

Plaintiff Ripley testified in his deposition that he had made a presentation to the Executive Committee meeting:

> Q.    Was there some debate within that committee meeting, when you were present, about the nature and extent of what admitting privileges they thought they might allow you, that you recall?
>
> A.    I don't think there was any move to allow me any privileges.  I don't recall a discussion.

Q.    Did you come out of your meeting with the medical
      executive committee thinking, I've got their full
      support, or, they're still not understanding what I
      want?

A.    You know, in all honesty, I don't know.  I don't have a
      recollection that I came out of there with a bad feeling.
      I came out of there with a feeling that they were
      willing to at least listen to what I had to say.

* * *

Q.    (By Mr. Ortiz) Let me hand you Deposition Exhibit 27,
      which is your correspondence to Dr. Studer.   It
      appears in reference in that letter that you're thanking
      them for getting to come to the meeting the previous
      evening.

A.    Yes.

Q.    And then you reference a paragraph, "What follows is
      not to be misconstrued as an expression of
      discontent."   But then you go on to clarify a very
      significant concern --

A.    Right.

Q.    Do you remember what they said in that committee
      meeting that prompted you to raise what you thought
      was a very significant concern?

A.    The way in which this letter was generated was the
      meeting that I had with Dr. Studer in the stairwell
      leading to the parking lot, at which he told me -- I
      asked Dr. Studer how the meeting went last night, and
      he said, well, we were thinking of -- something about
      having you -- offering you or doing something with
      admitting privileges as long as -- and I'm trying to

recall here.

The discussion was that there was some concern about me being allowed unrestricted admitting privileges, yes.   That's the context in which this letter came about, is that discussion I had with Dr. Studer in the stairwell.

Q.   And go ahead and maybe take a minute and look at the second page of your letter, Dr. Ripley.   Your second paragraph makes a statement that, "I am certainly not going to first refer to an M.D. or a D.O. to confirm my conviction of the need for their services for a medical condition."

A.   That's -- finish the sentence, please.

Q.   "For which I would then ask them to please admit my patient."

A.   That's true.   That makes no sense.

Q.   And I take it that's what you were told by Dr. Studer the committee was thinking we want to require.

A.   In so many words.   But let me simplify it from my perspective.   The notion was that I would be -- the notion was that I would ask a physician to confirm the fact that I think that there's a medical condition for which he or another physician needs to be involved in. And I don't understand why that's a difficult concept for anybody to understand.   That makes no sense.   If I've already made the determination that I need to have a physician involved in the patient's care, why would I then ask another physician to basically redo the same thing -- make the same assessment that I had just made and then either -- it just makes no sense.

57

Q.   So I take it that you got the impression from Dr. Studer that the committee was struggling to understand really what you wanted and why that should be allowed. Is that the impression you got? Is that what prompted this letter?

A.   I don't know what they were struggling with. I simply know that what Dr. Studer indicated to me needed to be clarified. And I was, quite frankly, trying to help him understand, as well. I did not think he had a full grasp of the nature of the admitting privileges I was requesting. But the letter is very specific and very clear as to what -- I mean, it's just very clear.

Q.   Well, in the third paragraph on the second page of your response letter, where you reference you strongly urge that the wording of the bylaws simply be limited to granting, quote, admitting privileges, period, and to further define or categorize this privilege only serves to create confusion or a basis of questioning of the privilege throughout the hospital, I take it you got the sense from someone, either Dr. Studer or during that committee, that they wanted to separately define or categorize the privileges you were seeking.

A.   I'll tell you exactly where that comes from. I'll tell you exactly where that comes from. Because this goes back to the patient -- one of the patients that was coadmitted on the floor previously. And I was with Dr. Brandon -- I don't know if it was the same infection case or not. But it may very well have been that infection case where Brandon Isaacs was assisting me with admission and following him on the floor with me.

And in the hallway -- not the hallway. In the doctors' -- in the nursing station, in full disclosure, I had indicated to the charge nurse that this patient was admitting with Dr. -- was going to be admitted with Dr.

58

Brandon Isaacs but that I was writing orders. And she said -- she asked Dr. Isaacs, well, what do we do with Dr. Ripley's -- if he's not an admitting physician, what do we do with his orders that' he's going to write? And Brandon Isaacs' response was -- excuse me. Dr. Isaacs' response to the nurse was, well, he's a consulting physician. He can write the orders he wants now.

Two things come up there which prompted this paragraph. Two things come up. Number one, if it's a continual, constant question of whether or not I have admitting privileges and what the status of my privileges are, nurses aren't going to have confidence in the orders that I wrote. They're always going to question my orders that I write. They're always going to want to go and get a physician to -- just like happened. And that's not a unique situation.

So the purpose of this paragraph is, we don't need that. All I'm asking for is admitting privileges, period. There doesn't have to be restrictions on it. The restrictions come by virtue of the fact that what I do as an oral surgeon is within the scope of practice. I am not asking for unfettered, unlimited, unrestricted admitting privileges. And they don't need to be specified, because it only causes confusion among the medical staff.

Q.   And then my understanding of the sequence of events -- and correct me if I'm wrong --

A.   And I apologize. May I please interrupt? In that paragraph, the last sentence --

Q.   Would it matter if I said no?

A.   Probably. Yes you can get me to shut up.

Mr. Kline: He can?

A.    The point I'm trying to make is, the last sentence says, "Oversight then becomes a matter of peer review," which is exactly where it should be.  It shouldn't be an ongoing issue every time I admit a patient to the hospital.

Q.    (By Mr. Ortiz) Now, my understanding of the sequence of events was, sometime after this November meeting that you attended, the executive committee was willing to put it for vote, so to speak, on a bylaw change.  Is that your understanding as well?

A.    Yes, I think so.

Q.    But, initially there was disagreement between you and Dr. Studer and others because you didn't like the manner in which they had phrased the bylaw change.

A.    The clarification of this letter is what we're talking about.

Q.    Wasn't there some subsequent --

A.    Yes.  I further went -- I worked with Susan Karavitis quite a bit on this throughout the entire process over many times and many visits.  I then went back down -- it might have been the same day, if not the next day -- and Susan Karavitis was the one doing the wording for the bylaws change proposal.  And I went in, and I sat down with Susan Karavitis, and I said, could we look at the wording of what the proposed bylaw change will be?  And there it was.  And I said, we just had this discussion.  My preference is that we take out this limitation that was in there.

And she did that.  She crossed it out, and she

60

reworded the whole thing.  And she went through the bylaws where all the different references were made so that it wasn't what's happened in the past.  It was changed here, but no elsewhere.  So she tried to do what I thought was a very thorough thing.  But that, in fact, was what was doing to then be presented to the medical staff as a bylaw change.  The wording of it basically took out the restrictions that were being talked about here.  And so she did that.

And that's my understanding of what went -- that's my understanding of what was going to go to the medical staff meeting of a vote on approval of the bylaw change.

Q.   Let me change topics with you for just a moment. Throughout this process when you were trying to get a bylaw change, you understood there were still the restrictions on your privileges that were causing you all this heartburn.  True?

A.   No, Scott, there were no restrictions on my -- there was a comment on, I believe it's Exhibit Number 4, from the credentials committee, that you informed me what it said.  I'd never read it.  But that was -- that document came after the document that I had received from Kathy Drinnon and a subsequent letter from Pam Fulks, granting me admitting --

Q.   I think you're misinterpreting my question, Doctor.

A.   No.  I think I'm right on point.

Q.   Go ahead.

A.   That letter says specifically, we're happy to inform you that your admitting and clinical privileges have been approved.   Your temporary admitting and clinical

privileges have been approved with the following recommendations from the credentials committee. And at the bottom of that, typewritten, were some conditions that cannot be read on the subsequent document where people signed off. And that was for temporary -- that had not yet gone to executive committee, and that had not yet gone to the board.

That was a letter from Pam Fulks, saying I had these temporary admitting and history and physical privileges, which I will point out said either a physician does the admission history and physical or they countersign and approve as adequate the one I would do. That's what that says, in a paraphrase. That was done without ever having yet gone to the executive committee or yet having gone to the board.

So it when goes -- and right after that letter, I think within three days, I write another letter to Dr. Sullivan, who was chairman--

Q.    And we went all through that in your first deposition, Doctor.

A.    Yes.    But I want to finish this, because this is important.

So I was given temporary admitting privileges and these conditions on a temporary basis for admission -- for histories and physicals. Never any question about admitting privileges, because it's there in writing.

It then goes to the executive committee.    And notwithstanding the recommendation of the credentials committee, notwithstanding their conditions, the executive committee then decides to approve my request for privileges without restrictions as requested, the executive committee.    Then it goes up to the

higher level of the board of the hospital, and the board of the hospital says, Dr. Ripley has his requested privileges approved as requested, whatever the terminology is.

So my point to you, Steve, you asked me a question of, did I realize I had restrictions?   I never had restrictions.

Q.    Then why were you fighting so much if you had no restrictions?

A.    Because the bylaws needed to be changed.  And there was not an issue for nine months, Scott.

Q.    Let me point out something in your prior testimony, Doctor, so you're not surprised. Didn't you specifically tell me in your first deposition that you no longer did any admissions after you received Mary MacGuire's letter in August of '04?

A.    Was it '04?

Q.    Yes.

A.    Well, whenever she wrote the letter.

Q.    Now, my question to you is, after Mary MacGuire's letter that started the firestorm in the fall of '04, did you continue -- when you got in to the summer of '05 and reactivated your practice, did you continue to admit patients on your own without getting another physician to admit for you?

A.    You know, Scott, I don't even know.

Q.    Was an issue raised with you in the end of November of '05 about the fact that you were continuing to admit

63

patients without having a physician to do that for you?

Mr. Kline: You said in '05?

Mr. Ortiz: Yeah, November of '05.

Specifically a patient on November 30th of '05, a pregnant patient.

Q.   (By Mr. Ortiz) Do you have any recollection of that, Doctor?

A.   Not right now, no.

* * *

Q.   (By Mr. Ortiz) Let me hand you an e-mail that's been produced in discovery --

A.   Actually, I do recall this patient, because they put her on a fetal monitor in the operating room, yes.

Q.   -- where there was an assumption that the admitting privileges situation had been worked out, but there was actually not an admitting order from the family practice physician.  Do you remember that situation, Doctor?

A.   Yes, I do.

Mr. Kline: Is there another question?

Q.   (By Mr. Ortiz) Is that an accurate summary in your e-mail of what occurred?

A.   There's so much misinformation going around here, I find it almost difficult to respond.

64

Q.  Well, did you admit the patient?

A.  Yes.

Q.  On your own?

A.  Yes. And, Mr. Ortiz, the temporary privileges with the comments from the credentialing committee fell by the wayside when I went through and got the executive committee to say I had unrestricted -- not unrestricted. My privileges were approved as requested. And the hospital board then said, you know what? It just doesn't matter. This is a stepwise fashion in which privileges were approved. Those conditions that were stated by Kathy Drinnon for my temporary privilege letter that I got were done before the executive committee met and before the board met. And I was given my requested privileges. There was no issue where I could not admit my patients and do the consults as necessary, as I've been talking about.

Q.  And I understand your interpretation, Doctor. My question is much simpler. I take it, in November of '05, you were still -- notwithstanding all the correspondence on this issue, you were operating under the premise that you had no restrictions on your right to admit or do your own history and physicals. True?

A.  That's right. I had the privilege request that I had requested, yes.

Q.  So all these other people that were complaining or raising the issue, different physicians, staff members, they were simply misconstruing the nature and extent of what you'd already been granted?

A.  I don't know what their motivation was.

65

Q.   Then, Doctor, I guess, can we agree that this was originally set for a vote, and then Dr. Studer sent out a notice that the medical staff meeting was being cancelled in January of '06?

A.   I think that's true, yes.

Q.   And I take it, were you specifically informed by anyone as to why that meeting was being cancelled?

A.   I've never found out, except in some of the comments in the depositions.

Q.   Were you informed by someone that the process -- that this actual proposal for a bylaw change was going to go to the medical staff development committee?

A.   I was never informed of that at all.

Q.   Ever?

A.   Ever. Well, at some point, I became aware of it. But no one ever sent me a letter that said, by the way, Dr. Ripley -- I think Dr. Studer put something in people's mailboxes. I recall a communication on that route. But no one ever talked to me -- no one's ever talked to me, ever, as to why they were refusing my request.

Q.   And my question is, again, simpler. Were you informed that this was actually going to go through a different process and it was going to go to medical staff development committee?

A.   I think the way I found that out was the piece of paper that was put in everybody's mailbox three or four days before the medical staff was supposed to vote on the issue. No one called me and said, by the way, we've got a change in plan. Specifically, Dr. Studer never

66

told me anything about that.

Ripley Deposition at 178-191.

When asked about his allegations with respect to conspiracy, the following

colloquy occurred between Dr. Ripley and Mr. Ortiz during his deposition:

Q.   You have alleged in this case that there is a conspiracy
which has transpired between members of the medical
staff and the hospital.  Are you aware of that?

A.   And where is that stated, and how is that worded.

Q.   Have you looked at the complaint you filed?

A.   Yes, I have.  I thought you were referring to a letter.

Q.   No.  I'm looking at what has been pled on your behalf
in this case where you have alleged conspiracies.  And
I guess I'm wondering, do you have any factual
information that would support a conspiracy between
any individuals in this case?

         * * *

Q.   (B Mr. Ortiz) Do you have any -- you know what the
word "conspiracy" means, don't you?

A.   Generally.  I don't know the legal definition of it, but I
know basically the concept.

Q.   Do you have any evidence that anyone conspired in
this case against you and that's what caused medical
staff development or the board to vote the way they
did?

         * * *

A.     Sure.

Q.     (By Mr. Ortiz) What's your evidence of conspiracy?

A.     The evidence of conspiracy is that there is something going on behind the scenes, the nature of which we hopefully will find out.   But there is no rational explanation as to why a reasoned look at this issue couldn't be resolved. And, in fact, it was going through the normal processes of being resolved after the third, if not the fourth try to get this to go through normal procedures. And it came right up to the moment of the medical staff meeting, and administration yanked it.

Now, this is well within the purview of a medical staff bylaws change, as is any other. And no one has ever explained to me why this is such a major problem in Casper, Wyoming and virtually nowhere else. So there is something going on that is keeping this from coming to a proper look-see and evaluation.

The various committees -- you know, I've done my very best to give the information and background on my training. And it's ignored or not -- it's ignored. It's not even reviewed or evaluated. Because I'm sure that the members on those committees, they've said all they had was a letter, or all they had was one or two things, in the various depositions.   They are not looking at this in a valid, rational, comprehensive way, which has been my request from day one.   I have never   tried   to   do   anything   in   this   hospital inappropriate. Why is it oral surgeons are so perceived by this hospital uniquely that we can't get this privilege, which is a core privilege?

So there is something going on that's precluding this from getting a fair hearing.   And we were at the doorstep of a fair heading by the medical staff. And it

68

is my conviction that it was going to pass. And it was yanked at the twelfth -- at eleven o'clock, if you want, at the eleventh hour, and redirected by administration.

Mr. Kline: 11:59.

Q.   (By Mr. Ortiz) Do you think that the physician members of the medical staff development committee that heard your plea and your presentation and saw all the papers you brought, do you think they are just unreasonable in their approach to not vote your way?

A.   I think that they don't have an appreciation of what an oral surgeon does. And regardless of any efforts I would make, they would still not get -- they still wouldn't get it. There is this clumping of oral surgeons in this concept of dentistry. And for the life of me, I can't figure out why a rational physician wouldn't understand the difference or at least acknowledge the extent of training oral surgeons have.

Q.   So if I can summarize what you've told me --

A.   I wasn't done.

Q.   I'm sorry. Finish up.

A.   The concept here is very similar for what's gone on for the last 60 to 70 years with medical doctors, first with doctors of osteopathy, and then medical doctors and doctors of osteopathy, once they became accepted, with chiropractors and holistic physicians and so forth. I'm not making an argument for them. Oral surgery is uniquely in a position to have taken the time and effort to develop its profession to allow it to do the things that I'm asking to do. And that battle has been fought for over 60 years and is generally won everywhere but Casper, Wyoming.

So there's got to be some reason behind the scenes that I'm not fully aware of that this thinking still says, well, he's just a dentist.  He doesn't know anything else.  Therefore, he's a danger to our patients.  That has just never happened.  That's never been proven.

Q.    So the fact that, for whatever reason, you could not convince the physicians and lay people on these committees and boards to vote your way leads you to speculate there must be another reason.  True?

A.    There is another reason, or it would have gone my way.  There is another reason.

Q.    Do you hold out the possibility, Doctor, that maybe there are reasonable minds that disagree with your proposition on what the scope of your practice ought to be?

A.    No.  No, I do not.

Q.    Then don't you think it's odd, if it is so generally recognized that oral/maxillofacial surgeons are just as well trained as medical doctors and doctors of osteopathy, that they're not considered M.D.s in the medical community?

A.    Steve --

Mr. Kline: That's Scott.

Q.    (By Mr. Ortiz) Doesn't that strike you as odd?

A.    No, it doesn't strike me as odd at all.  I've addressed this issue at other hospitals throughout my career.  And every single time when I've presented them with a rational basis for my training and a rational basis for my experience and board certification and all of the

stuff that you have to go through, every single time the privileges have been modified. The wording is not unique. But the fact is, the fact that this hospital is so rigid in their opposition to my specialty is very unique.

Q      Other than you just assuming something must be going on, do you have any tangible evidence that there is someone behind the scenes saying something to your detriment about you or your profession?

A.     Wait. We're not going to label Jim Ripley as being paranoid.

Q.     I'm looking for evidence to support sweeping allegations of conspiracies.

A.     There's no sweeping allegations of conspiracies. There is a very specific circumstance here. And I've done everything I can possibly do. and it was going through the process. And you tell me that there's no evidence in that this was yanked at the eleventh hour for a reason that makes no sense.

Q.     Well, let me ask you this. Have you considered the fact -- would you have thought it to have been fair, Dr. Ripley, if this goes to a vote on the floor of medical staff and one of your competitors, someone from -- a plastic surgeon or an ENT stands up and says, listen, oral surgeons are not as well trained as us. Guys, we're all crazy to let Dr. Ripley and OMSs have these full privileges. Don't do it.

A.     And what --

Q.     Now, let me finish my question.

A.     I was going to say, what is your question?

71

Q.      Would you have felt that this was fair for your competitors in the medical staff to be able to vote on that issue and argue against you?

A.      Not only would that be fair, that is exactly what I was asking for.  Not only would it have been fair, that's exactly what I faced throughout my entire career.  Not only would it have been fair, it would have been exactly the type of exchange that I would have enjoyed, and I would have prevailed.  And, quite frankly, the vote was there.

Q.      Now, you know that that's going to be discussed behind closed doors without you necessarily being present, don't you?

A.      What?

Q.      This discussion with your competitors.

A.      No, it won't occur without my being there.  It will be in an open forum in a medical staff meeting.  And if it was behind closed doors without my presence, that certainly is a conspiracy, Scott.

Q.      Have you ever been advised that allowing competitors to make the decision as to let another subspecialist practice in a certain area does implicate --

A.      That is --

Q.      You got to let me finish.

A.      I'm sorry.  Go ahead.

Q.      -- does implicate antitrust concerns?

A.      That is bogus.

72

Q.    You've never heard that in any context?

A.    No, I've never heard it.  And, quite frankly, I've faced
      it my entire career.  I have no problem standing up in
      front of a group of the medical staff and saying, in
      opposition to the plastics and ENT surgeons that these
      are just dentists, and they have no business managing
      scars in the emergency room.  I've dealt with that my
      entire career.  And guess what?  I've always prevailed.
      My specialty has always prevailed because it's always
      been able to be assessed and evaluated by rational
      people.  Give me the opportunity to talk to my plastics
      and ENT friends and give me the opportunity to have
      a professional exchange, and my specialty will prevail.

Q.    Okay.  I understand your position.

      Your restraint of trade group boycott claim specifically
      alleges that the defendants and other unnamed
      individuals combined and conspired to illegally boycott
      you and other OMSs without M.D. or D.O. degrees and
      prevented them from obtaining hospital staff privileges
      and providing services.   Other than what you've
      already told me, that you assumed something must be
      going on behind the scenes, do you have any evidence
      to support that allegation?

A.    That is a fact.

Q.    What evidence do you have to support that allegation?

A.    The fact is in the letters.  It says they're not going to
      review this, that they've decided through non-normal
      channels that they're not going to do this.  It's a fact
      that you are excluding oral surgeons, single-degree
      oral surgeons, from admitting patients. To that
      hospital.  It is a fact.

Q.   I understand your assertion that you think it's a fact.
     I want to know, do you have any basis for your belief?

* * *

Q.   (By Mr. Ortiz) Do you think it's in the correspondence
     that's already in evidence?

     Mr. Kline: Well, I don't object to the question other
     than what's already been testified to.

     Mr. Ortiz: Well, that's what I want to know.

Q.   (By Mr. Ortiz) Do you have anything in addition to
     what you told me a couple minutes ago, that
     something must be going on if people aren't agreeing
     with your position?

A.   Something is going on, and it's in the form of writing
     that we have all reviewed in various exhibits that have
     been presented.  Something is going on.  It is being
     prevented from a fair and objective hearing by the
     medical staff.   It is being interfered with by
     administration.   It is being interfered with by
     inappropriate recommendations to the board.   The
     original application that I had got it right.

Q.   But, Doctor, you understand I'm asking you a very
     narrow question.  I don't need your philosophical
     overview on why you're right.  I want to know if you
     have any evidence that we haven't already talked
     about to support any of these claims about
     conspiracies, boycotts, things like that.

* * *

A.   I'll just simply say -- and I don't think it's redundant.
     In the context of your question, Mr. Ortiz, I have the

74

documentation that allowed me temporary admitting privileges with some modifications for H and P privileges during a temporary basis, during which time that then went to the executive committee, and the executive committee approved my privileges as requested, overruling that exception.

And that went to the board, and they approved my privileges as requested, which further overruled the comment from the credentialing committee. So I had the privilege. I went ahead and operated, and I went through the initial period of review, and I was approved. So those temporary privileges became permanent privileges.

I then went and did what I did for nine months. And somebody, through misinterpretation and not understanding that those restrictions from the credentialing committee no longer applied, initiated a process -- who knows who that is? I have a suspicion. but that process was reinitiated and culminated in the letter from Mary MacGuire that said, frankly, no, your privileges are over and done with. And, in fact, she says this can be remedied very quickly.

But the point is, I had the privileges. I operated under those privileges. And somebody behind the scenes, as manifested in the letter from Mary MacGuire, said, no, Jim Ripley, you don't have those privileges anymore that you thought you had, that you have written proof of. So yes, there a conspiracy there.

Ripley Deposition Vol. 2, at 230-240.

As is evident from the extensive excerpts above, there is no evidence of an agreement, as contemplated by the case law discussing Section 1 of the

75

Sherman Act, that supports plaintiff's contentions in this case.  His speculations

that a conspiracy at WMC existed with the specific intention of keeping him from

acquiring full admitting and H&P privileges simply are not sufficient to support

his claim.  In the absence of such evidence, the Court finds that the defendant

is entitled to summary judgment as a matter of law on Count 1 of the complaint

alleging a group boycott in violation of Section 1 of the Sherman Act.

It is also uncontroverted that the plaintiff has been, and is, able to

practice his specialty.   He has not been precluded from performing the

surgeries associated with his specialty.   He has exercised his privileges and

agrees that he can perform the full scope of his surgical practice.   Ripley

deposition vol. 2 at 247.  He testified:

> Q.   So let me ask you this.  In light of Mary MacGuire's letter in 2004, you stopped doing your own admissions?
>
> A.   That's correct.
>
> Q.   Yet you continued to perform your services and provide the OMS expertise at the Wyoming Medical Center if asked to do so?
>
> A.   Only in the scenarios where the patient required treatment.  I've done no elective stuff in the hospital of my own admission.  I've had other doctors call me off service and ask me to do whatever I do, and I've done that, operated off of their service.  That's happened.

Q.   After Mary's MacGuire's letter in 2004, have you done any elective procedures at the Wyoming Medical Center?

A.   Well, "elective" meaning admitting elective? They're in the hospital for infections.  I've done those patients.  That, to me, is not elective.  It's not an emergency, but it's also not elective.

Q.   Let's put in this context.  One of your patients comes in in an office context, and they want an elective procedure that would most appropriately be done at the Wyoming Medical Center.

A.   I have not admitted them.

Q.   Have you made an effort -- or has that situation occurred, where you have had someone that wanted an elective procedure and you wanted to admit them to the hospital?

A.   Yes.

Q.   Did you make any effort to ask another physician to do the admission for you so you could do the elective procedure?

A.   Not if it's otherwise a case that I would not normally do that, no.

Q.   Why not?

A.   Because it's not necessary.  And, quite frankly, those patients are being stacked up for the summer.

Q.   Explain that.

A.   I've got several joint cases that I can do electively.

77

I've got some orthognathic cases that are in the process of being treated with orthodontics, and so forth, that are going to be done this summer somewhere.

Q.    Tell me why you're stacking up cases to do them in the summer.

A.    Because I'm not giving Wyoming Medical Center any elective dollars.  If they're going to treat me this way, I'm not giving them any money.  I will do what I need to do to take care of emergencies.  I will give them none of my business.

Q.    So what you're telling me, Doctor, is, in response to Dr. MacGuire's letter, your position has been, I'm not going to do any of my elective procedures there, because you might benefit from it.  True?

A.    That's fair.  I'll go with that.

Q.    Is that a true statement?

A.    I'm not giving them any income, from my patients electively.

Q.    Although you know if you choose to, you could have simply called a physician from any specialty to help you do an admission if you wanted to do them at the Wyoming Medical Center.  Is that true?

A.    That is medically unnecessary and costs my patients money.

Q.    My question, Doctor, is, could you have done it?

A.    But I won't do it, because it's wrong.  There is no reason for me to have to ask a physician to admit my

patients when there is no comorbidities or anything. There's no reason to do that.   That's medically unnecessary to do that.  And my patients going to pay for that somehow.   They either pay for it directly, because the hospitalist is going to charge them, or if the hospital doesn't charge them, which I doubt, that gets added to their bill some other way, or you and I who have insurance make up the difference, for the money lost at the hospital.   There is no dollar justification for admitting a patient by a physician when I can do it myself and I've done it for however many years.

Q.   How about a patient of yours that wants an elective procedure that does have other medical issues?

A.   What about that?

Q.   Would you then employ or utilize a hospitalist or another physician and admit them to the Wyoming Medical Center?

A.   I would admit the patient and ask the hospitalist to take care of that medical problem.

Q.   Has that situation occurred since --

A.   No.

Q.   Let me finish my question.

A.   I'm sorry.

Q.   Has that situation occurred, where you have a patient, elective procedure with medical comorbidities, and you have admitted that patient to the Wyoming Medical Center for an elective procedure?

A.    No.

Q.    So the situation just hasn't arisen?

A.    No.

Q.    Maybe the issues in this lawsuit are more narrow than
      I thought, then, Doctor.   Is your complaint in this
      lawsuit not about patients that might have a medical
      comorbidity, but about a patient that you think does
      not have any underlying issues, strictly a dental
      patient, and you having to use a physician at the
      medical center in order to admit that patient?  Is that
      the main complaint you have?

A.    The complaint I have, I'm not sure -- no, it's not more
      narrow than that.   It's that I'm not able to admit
      patients that I should be able to admit, for whatever it
      is I do.  Dental doesn't fit in here.  That's a limiting
      construct I'd like to avoid.  Because I'm a maxillofacial
      surgeon, oral and maxillofacial surgeon, and do much
      more than dental.

      The point I'm trying to make here, Scott, in all fairness
      -- I'm trying to be very blunt with this -- I have the
      training to admit ASA 1 and 2 patients without any
      oversight or review of anybody only insofar as that's a
      normal process that occurs with every physician that
      works at Wyoming medical Center.  And, in those cases
      that aren't ASA 1s and 2s, then just like any other
      hospital provider in Wyoming Medical Center, they get
      a consultation and take care of those problems.  So I'm
      not asking for anything other than what every other
      doctor at Wyoming Medical Center has the ability to do.
      That's it.

Q.    And I think you did answer my question.  If understand
      you correctly, it is more of a philosophical difference of

opinion, in the context that they don't treat you just like an M.D. or a D.O.?

A.       No, it's not philosophical at all.  There's a philosophical component to it.  But the fact of the matter is, if you come to me and I see you at 3:00 in the afternoon in my office and you've got a walled-up expanding cellulitis of your face that is, or will immediately affect your airway, that patient needs to go to the hospital right now.  I'm not going to call up my buddy down the street and say, would you admit this patient for me?  I've got to go to the OR in five minutes.  That's a reality.  That actually happened, and that actually happened at this hospital.

Ripley deposition at 124-129.

None of the evidence offered by the plaintiff in this case is sufficient to satisfy the Court that there is any indication of any agreement whatsoever between the many named defendants to restrict competition and restrain trade. The fact is plaintiff has not been denied access to hospital facilities and he is unquestionably able to perform the surgeries associated with his specialties. He is, under the hospital's bylaws, an allied health professional. Notwithstanding his vigorous assertions to the contrary, the fact that his efforts to amend the pertinent bylaws to address his specialty, oral and maxillofacial surgery, and separate his specialty out from the bylaws relevant to dentists, podiatrists, chiropractors and other allied health professionals failed does not support his group boycott claims asserting Section 1 Sherman Act violations.

81

There is ample evidence that tends to exclude the possibility that the defendants were acting independently, for non-conspiratorial reasons, and not pursuant to any agreement.  Simply because oral and maxillofacial surgeons are treated under the WMC bylaws in a manner that is unacceptable to plaintiff Ripley does not establish the concerted action requirement necessary for a Section 1 Sherman Act violation.  See Abraham v. Intermountain Health Care Inc., 461 F.3d 1249, 1256-1263 (10th Cir. 2006). The defendants are entitled to summary judgment on this claim.

Count 2 of plaintiff's complaint asserting an illegal tying agreement likewise fails as a matter of law in the Court's opinion.  The Tenth Circuit addresses this in Abraham v. Intermountain Health Care Inc., 461 F.3d at 1263, as well:

> "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product.'" Eastman Kodak v. Image Technical Servs., Inc., 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting N. Pac. R. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).  Tying arrangements are unlawful "[b]ecause they deny competitive access to the tied product market on the basis of the seller's leverage in the tying product market, and force buyers to forego free choice between sellers." Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 834 (7th Cir. 1978).  In this case, the Plaintiffs allege that IHC tied the sale of managed care plans in Utah (the "tying" product) to the provision of NSEC (the "tied" product).  In other words, the Plaintiffs contend that purchasing an IHC managed care plan also

requires the buyer to purchase NSEC only from an IHC panel ophthalmologist, rather than from a different source such as an optometrist.  The District Court concluded that the Plaintiffs failed to establish the existence of two separate products, which is a necessary prerequisite to a finding of an illegal tie.  See Sports Racing Servs., Inc. v. Sports Car Club of Am., 131 F.3d 874, 886 (1997) (citing Eastman Kodak, 504 U.S. at 462, 112 S.Ct. 2072). The court concluded that IHC "only market[s] a single product: access to health care priced to subscribers and paid to health care providers according to prior arrangements made with those providers."  Abraham, 394 F.Supp.2d at 1319-20.

Whether products can be considered distinct "turns not on the functional relation between them, but rather on the character of the demand for the two items."  Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 19, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, --- U.S. ----, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).  That is, "the mere fact that two items are complements, that 'one ... is useless without the other' does not make them a single 'product' for purposes of tying law."  United States v. Microsoft Corp., 253 F.3d 34, 86 (D.C.Cir. 2001) (quoting Jefferson Parish, 466 U.S. at 19, 104 S.Ct. 1551) (alteration in original; internal citation omitted). Given this backdrop, the Plaintiffs contend that managed care plans in Utah and NSEC are separate products because "there is separate consumer demand for such eye care services" apart from the sale of managed care plans.   Indeed, IHC admits that there a substantial consumer demand for optometric services apart from the sale of managed care plans.  There is also evidence that IHC's enrollees want to patronize optometrists rather than IHC panel ophthalmologists for NSEC and that enrollees sometimes visit optometrists -- and pay for services out of their own pocket -- rather than visiting one of IHC's panel ophthalmologists. Therefore, the Plaintiffs argue that managed care plans and NSEC are two products.

On the other hand, in the only case with similar facts to those at issue here, the Ninth Circuit held to the contrary.   In

Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau, 701 F.2d 1276, 1289 (9th Cir. 1983), the plaintiff claimed a tie between a health plan's pharmacy benefits and restrictions on the pharmacies enrollees could use to reap the plan's benefits. The Ninth Circuit held that the benefits and the restrictions were one product, reasoning that:

> Insureds, the consumers, certainly did not consider these as two separate products. In deciding whether to buy the pharmacy benefit, they made just one decision, comparing the expected cost of the benefit plus copayments for drug purchases against the expected cost of drugs bought at the independent pharmacies. The risk insureds sought to transfer was the risk of high pharmacy bills. The product these consumers sought was a means by which they could satisfy their drug needs on favorable terms. Their purchase of drugs in the required manner was the consummation of the pharmacy benefit, not an unwanted and unnecessary product tied to the desired product.

Id. at 1290; see also De Modena v. Kaiser Found. Health Plan, Inc., 743 F.2d 1388, 1396 (9th Cir. 1984) (rejecting the premise that "a drug plan and the drugs provided under that plan are separate commodities.").

It has been suggested, however, that Klamath-Lake sweeps too broadly:

> Th[e] reasoning [in Klamath-Lake] implies that any bundling of health insurance with the provision of medical goods and services is a single product. For all such insurance, the consumer choosing a plan compares its premium plus expected copayments against the expected cost of buying the covered medical goods and services from independent suppliers. And the purchase of the medical goods and

services from the plan is the consummation of the insurance benefit. But this logic is far too sweeping. For any tie, a rational buyer compares the expected cost of the bundle to the expected cost of buying the items unbundled elsewhere. And, having contracted for the bundle, receiving the bundle is the consummation of the buyer's contract. Thus, literally applied, the courts' logic suggests that all ties involve single products.

10 Phillip E. Areeda & Herbert Hovencamp, Antritrust Law ¶ 1745g4 (2004) (hereinafter "Areeda & Hovencamp").

We agree with this analysis. Although powerful economic reasons may justify the bundling of medical insurance with the provision of the goods and services that fall within the plan's parameters, [footnote 9 omitted] such bundling does not transform the managed care plan itself and the provision of its benefits into a single product.

Our analysis, however, does not end there. It is undisputed that IHC does not sell NSEC and that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product." Jefferson Parish, 466 U.S. at 12, 104 S.Ct. 1551. Although it is critical to a tying claim that the seller forced a buyer to purchase the tied product in order to get the tying product, "it is not critical that the buyer have purchased the tied product directly from the seller." Sports Racing Servs., 131 F.3d at 887. Because the alleged tying arrangement at issue involves the sale of the tied product by a third party -- namely, panel ophthalmologists -- distinct from the sale of the tying product, we must evaluate IHC's economic interest in the sale of the tied product. We have explained:

An illegal tie may be found where the seller of the tying product does not itself sell the tied product but merely requires the purchaser of the tying product to buy the

tied product from a designated third party rather than from any other competitive source that the buyer might prefer.

However, where a third party is involved in selling the tied product to the plaintiff, most courts have required that the tying product seller have a direct *1266 economic interest in the sale of the tied product before an illegal tying arrangement will be found.

Courts that have imposed the economic interest requirement when the tied and tying products are sold by different, unrelated sellers have done so generally on the grounds that if the tying product seller does not have an economic interest in the sale of the tied product, the seller is not attempting to invade the alleged tied product or service market in a manner proscribed by section 1 of the Sherman Act.

Sports Racing Servs., 131 F.3d at 887-88 (internal citations and quotation omitted).

Unlike the cases in which courts have held the "economic interest" requirement satisfied because the seller of the tying product receives an economic benefit from the sale of the tied product, see, e.g., id. at 888 (seller of racing services received economic benefit from third party sale of race cars); Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1570-72 (11th Cir. 1991) (defendant multi-listing service required real estate brokers wanting to use the service to join branch of realtor organization in which service may have had an interest), Ohio-Sealy, 585 F.2d at 833-34 (licensor of mattress trademark required licensee-manufacturers to purchase mattress component from a particular source and licensor received a percentage of component sales), in this case, IHC receives no economic benefit from the sale of NSEC. To the contrary, IHC reimburses its panel ophthalmologists each time they provide NSEC. Far from profiting

86

> from the sale of NSEC, IHC expends money when NSEC is sold. We
> therefore conclude that IHC has no economic interest in the sale of
> NSEC. The Plaintiffs' tying claim fails for this reason. [footnote 10
> omitted] See Beard v. Parkview Hosp., 912 F.2d 138, 140-44 (6th
> Cir. 1990) (no tying arrangement where hospital required its
> patients to purchase radiology services from third party from whom
> hospital received no economic benefit); White v. Rockingham
> Radiologists, Ltd., 820 F.2d 98, 104 (4th Cir. 1987) (no tying
> arrangement where hospital required CT scans to be interpreted by
> specific group of radiologists and where hospital did not compete
> in the market for interpretations of CT scans and did not receive
> any of the radiologists' fee for their interpretations); Robert's
> Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d
> 1403, 1407-08 (9th Cir. 1984) (no tying arrangement where airline
> offered lower-priced tickets if the purchaser also rented a car from
> a particular company because there was no evidence the airline
> had an economic interest in car rentals).

Abraham v. Intermountain Health Care Inc., 461 F.3d at 1263-1266 (footnotes

omitted).

In the Court's view, there is no evidence sufficient to support any illegal

tying claim in this case. There is not evidence of two illegally tied products. At

best, the restriction on Dr. Ripley's privileges to admit patients is, as has been

determined by the policy makers at WMC, a reasonable, objective, legitimate

and verifiable educational qualification necessary to perform those services at

WMC. The hospital's decisions in this regard are discretionary and not subject

to review by this Court in this back door way brought in the guise of an anti-

trust case designed to micro-manage WMC and its method of granting

privileges.   Those policy decisions are best made by the hospital and its governing boards and decision makers and should not, in this context, be second-guessed by this Court or plaintiff Ripley.   Defendants are entitled to summary judgment on count 2 of plaintiff's complaint alleging an illegal tying agreement in violation of the Sherman Act.

As to plaintiff's claims asserting Section 2 Sherman Act violations, the Court finds that the defendants are entitled to summary judgment.  This claim requires proof of the following elements:

> "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

Aspen Skiing co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 2854 at n. 19, quoting United States v. Grinnell Corp., 384 U.S. 563, 570-571, 86 S.Ct. 1698, 1703-1704, 16 L.Ed.2d 778 (1966).

Here, there is no indication in the evidence that is available in this case that the hospital's discretionary decisions limiting Dr. Ripley's admitting and H&P privileges was done for anticompetitive or exclusionary purposes.  There is no indication that, because of this decision by the hospital with respect to plaintiff Ripley's admitting and H&P privileges, consumers do not have access

to oral and maxillofacial surgery services, other than Dr. Ripley's own choice not to use WMC for elective surgeries.  There is no evidence, other than bare conclusory speculation by plaintiff Ripley, that the requirement for another physician or hospitalist to admit plaintiff's patients, increases costs to consumers or limits patient access to these services.  In fact, it appears that the evidence in this regard is to the contrary.  Again, this Court is not in a position to second-guess this legitimate business decision and substitute plaintiff's preferred policy  instead.  Accordingly, the Court finds that the defendants are entitled to summary judgment on this claim as well.  It is therefore

**ORDERED** that defendant's Motion for Summary Judgment on all of the plaintiff's anti-trust claims shall be, and is, **GRANTED.**

Dated this ___23___ day of ___January___ 2008.

UNITED STATES DISTRICT JUDGE

APPENDIX A

Wyoming Medical Center, Inc. Bylaws provide in part:

Section 3 - Medical Staff Bylaws, and Rules and Regulations

Bylaws, Rules and Regulations for the Medical Staff shall set forth its organization, and government including the following; mechanisms for appointment; mechanisms for the granting, termination, curtailment and revision of clinical privileges; mechanisms for liaison between the Board of Directors and the Medical Staff; and the quality assurance, peer review and other responsibilities of the Medical Staff as required by the Joint Commission on Accreditation of Healthcare Organization and applicable law.

The Medical Staff Bylaws, Rules and Regulations shall be adopted as provided in the Medical Staff Bylaws.  The ultimate authority to adopt or amend the Medical Staff Bylaws, and Rules and Regulations, shall be vested in the Board of Directors.

Section 4 - Admission of Patients

Only members of the Medical Staff in good standing and who hold appropriate admitting privileges can admit patients to WMC. Physician, podiatrist, and dentist members of the Medical Staff as provided in the Medical Staff bylaws and Rules and Regulations and as authorized by law, shall be responsible for the medical aspects of patients' care and shall practice only within the scope of their clinical privileges as granted by the Board of Directors.  The quality of care provided by these individuals to patients of WMC shall be reviewed as part of WMC's quality assurance program management program and in accordance with the Medical Staff Bylaws, Rules and Regulations.

\* \* \*

Section 8 - Allied Health Professionals

Allied Health Professionals shall function as provided in the Medical Staff Bylaws.  For purposes of these Bylaws, the term "Allied Health Professional" shall have the meaning set forth in the Medical Staff Bylaws.  The Board of Directors shall determine which categories of Allied Health Professionals shall be allowed to practice within WMC.

The Medical Staff Bylaws for WMC includes the following definitions:

1.1  "Allied Health Professional" or "AHP" means an individual, licensed in the state of Wyoming, who may not be a Member of the Medical Staff as defined herein and is not an employee of the Hospital, but who is qualified by academic and clinical training to function in the Hospital and is granted some Clinical privileges.

* * *

1.5  "Clinical privileges" means the permission granted to Medical Staff members or Allied Health Practitioners to provide patient care and includes unrestricted access to those hospital resources including equipment, facilities and hospital personnel which are necessary to effectively exercise those privileges.  Privileges granted also means the right to exercise those privileges.

* * *

1.9  "Medical Staff" means those physicians M.D. or D.O., dentists and podiatrists who have been admitted as members of the Medical Staff in their respective capacities pursuant to the terms of these Bylaws.

* * *

1.11 "Oral Surgeons" shall be interpreted to refer to licensed dentists who have successfully completed a post-graduate program in oral surgery accredited by a

nationally recognized accrediting body approved by the United States Office of Education.

1.12 "Physicians" are any individuals with an M.D. or D.O. degree who are fully licensed by the Wyoming State Board of Medicine to practice medicine or osteopathy in the State of Wyoming.

* * *

1.16 "Admitting Physician" means the physician that admits the patient to a bed or treats the patient in the Emergency Department or the physician, resident, or physician assistant that ordered the outpatient tests/services or treats the patient on an outpatient basis.

1.17 "Attending Physician" means the physician responsible for the daily care of the patient while in the emergency room or the hospital or the physician, resident, or physician assistant that ordered the outpatient tests/services or treats the patient on an outpatient basis.

***

## CHAPTER 3  MEMBERSHIP

## 3.1   NATURE OF MEMBERSHIP

No physician, including those in a medical administrative position by virtue of a contract with the Hospital, shall admit or provide medical or health-related services to patients in the Hospital unless he or she is a member of the Medical Staff or has been granted temporary privileges in accordance with the procedures set forth in these Bylaws. Appointment to the Medical Staff shall confer only such Clinical

Privileges and prerogatives as have been granted in accordance with these Bylaws. Membership is not a right of any person. Every qualified person who seeks or enjoys Medical Staff membership must continuously meet and demonstrate to the satisfaction of the Medical Staff and Board the qualifications, standards and requirements set forth in these Bylaws.

3.2    QUALIFICATIONS FOR MEMBERSHIP

3.2-1 GENERAL QUALIFICATIONS

Only physicians who:

(a)    document their (1) current licensure; (2) adequate experience, education, and training, (3) current professional competence, (4) good judgement, and (5) adequate physical and mental health status, so as to demonstrate to the satisfaction of the Medical Staff and the Board that they are professionally and ethically competent and that patients treated by them can reasonably expect to receive quality medical care;

(b)    are determined (1) to adhere to the ethics of their profession, (2) to work with others so as not to adversely affect patient care, (3) to keep as confidential, as required by law all information for records received in the physician-patient relationship and (4) to be willing to participate in and properly discharge those responsibilities determined by the Medical Staff;

(c)    maintain in force professional liability in accordance with the terms and not less than the minimum amounts, required by the Board;

shall qualify for membership on the Medical Staff.

Document 35-5, at 20-61.